**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| **AMERICAN MUNICIPAL POWER, INC.,** ) | **Civil Action No. 2:11-cv-131** |
| ) | |
| **Plaintiff,** ) | **Judge Michael H. Watson** |
| ) | |
| **v.** ) | **Magistrate Judge E.A. Preston Deavers** |
| ) | |
| **BECHTEL POWER CORPORATION,** ) | |
| ) | |
| **Defendant.** ) | |

**AMERICAN MUNICIPAL POWER, INC.'S**
**MEMORANDUM IN OPPOSITION TO BECHTEL**
**POWER CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS AND LOC. R. 7.2(a)(3) SUMMARY

I.  INTRODUCTION..................................................................................................1

*Extensive facts cited by AMP along with a fully supported expert opinion that Bechtel wantonly breached its EPC Contract with AMP precludes entry of summary judgment. Furthermore, due to an intervening Ohio Supreme Court opinion, Bechtel's reckless conduct, in addition to its wanton conduct, renders the EPC Contract's limitation of liability clause unenforceable. Finally, AMP's damage claim, seeking reliance damages, is neither speculative nor uncertain.*

II.  STATEMENT OF FACTS.....................................................................................2

    A.  Background ................................................................................................2

    B.  The RFP and Bechtel's RFP Response ...................................................3

    C.  AMP's Response to Bechtel's Proposal...................................................5

    D.  Summer and Fall of 2008 ........................................................................6

    E.  The EPC Contract.....................................................................................9

    F.  Bechtel's Extensive Historical and Contemporaneous Cost Records and Data on Bechtel's "Similar" Projects .........................................12

    G.  January 2009 – May 1, 2009.................................................................14

    H.  May 2009 ................................................................................................16

    I.  June – November 2009.............................................................................19

III.  THE LEGAL STANDARD FOR RULING ON A RULE 56(a) MOTION FOR SUMMARY JUDGMENT .......................................................................25

*The high standard for granting a Rule 56(a) motion for summary judgment is well-settled. Namely, a court must construe the evidence produced in the light most favorable to the non-moving party and draw all justifiable inferences in favor of the non-moving party. Credibility determinations are outside the scope of summary judgment. Finally, wanton or reckless conduct is an issue of fact for the trier of fact. Applying those standards, if there exists any genuine dispute of material fact, summary judgment must be denied.*

    ***Primary Authorities:***

    *Fed. R. Civ. P. 56(a)*

    *Electro-Mechanical Corporation v. Ogan, 9 F.3d 445, 448 (6th Cir. 1993)*

    *Gallo v. Prudential Residential Servs., Ltd. Pshp., 22 F.3d 1219 (2nd Cir. 1994)*

*Nelms v. Wellington Way Apartments, LLC*, No. 11-3404, 2013 WL 408034, 6 (6th Cir. Feb. 4, 2013)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)

*Galloway v. Chesapeake Union Exempted Vill. Schs. Bd. of Educ.*, No. 1:11-cv-850, 2012 WL 5268946 (S.D.Ohio Oct. 23, 2012)

**IV.    ARGUMENT**.......................................................................................**26**

    **A.    A Limitation of Liability Clause is Rendered Unenforceable by Willful, Wanton or Reckless Conduct, Which are not Interchangeable** ........**26**

*Subsequent to this Court's 2012 Order on Bechtel's motion to dismiss, the Ohio Supreme Court held that wanton conduct is distinct and not interchangeable with reckless conduct. Based upon established Ohio law, a finding of wanton conduct or an independent finding of reckless conduct renders the EPC Contract's limitation of liability clause unenforceable.*

    ***Primary Authorities:***

*Anderson, Admr., v. City of Massillon, et al.*, 134 Ohio St.3d 380 (2011)

*Transcontinental Ins. Co. v. Simplex Grinnel, LP*, No. 3:05-cv-7012, 2006 WL 2035571, (N.D. Ohio 2006)

*Nahra v. Honeywell, Inc.*, 892 F. Supp. 962, 969-70 (N.D. Ohio 1995)

*Solid Gold Jewelers v. ADT Security Sys., Inc.*, 600 F. Supp.2d 956, 964 (N.D. Ohio 2007)

    **B.    The Gravamen of Plaintiff's Complaint is Bechtel's Wanton and Reckless Breach of the EPC Contract's Trend Related Provisions** ...............**28**

*The substantive and substantial body of evidence submitted by AMP, including expert opinion testimony, regarding Bechtel's wanton and reckless breach of the EPC Contract's trend requirements establish a genuine dispute of material fact precluding summary judgment.*

    **C.    The EPC Contract's Trend Provisions** ................................................**29**

        **1.    Bechtel was Contractually Obligated to Trend Potential Cost and Schedule Impacts Against the Indicative Target Price in Accordance with Professional Standards** .............................**29**

        **2.    Preliminary Phase**........................................................................**30**

        **3.    Formal Trend Program**...............................................................**30**

4.        Identification of Potential Cost and Schedule Impacts ........................31

*Bechtel's contention that AMP agreed to limit Bechtel's trend obligations to scope items is factually without merit and contrary to law. Bechtel was obligated to trend **all** potential cost impacts under the EPC Contract, Bechtel's corporate policy and Professional Standards. Oral modifications to the EPC Contract, which Bechtel alleges and AMP denies, are precluded by the contract's "no modification except in writing" clause and Ohio law.*

> **Primary Authorities:**
>
> *Kelley v. Ferraro, 936 N.E.2d 986, 994-95 (Ohio Ct. App. 2010)*
>
> *DiPietro v. Morgan Stanley DW, Inc., 517 F. Supp. 2d 1016, 1025 (S.D. Ohio 2007)*

5.        The Current Estimate ..................................................................34

6.        Reporting to AMP ......................................................................34

7.        Other Related Provisions ..........................................................35

D.        **Bechtel Materially Breached the EPC Contract** ..................................35

*Bechtel materially breached the EPC Contract by failing to i.) implement a complete trend program starting January 1, 2009; ii.) maintain a formal trend program; iii.) assign a trend engineer; iv.) trend against its Indicative Target Price; and, most significantly, v.) trend and report to AMP on potential cost impacts from Bechtel's experience on other projects. At a minimum, a genuine dispute of material fact exists regarding Bechtel's material breach of the EPC Contract.*

E.        **Bechtel's Conduct Was Wanton and Reckless** ....................................37

*Substantial record evidence exists that Bechtel failed to exercise any care toward AMP with respect to its trend obligations in the face of known great potential harm to AMP. Further, substantial record evidence exists that Bechtel exhibited a conscious disregard or indifference to a known or obvious risk of harm to AMP in breaching its trend obligations which was unreasonable under the circumstances. Bechtel completely failed to perform its trend obligations even though Bechtel's entire AMPGS project team had ready access to data from similar projects showing skyrocketing costs. Bechtel failed to appoint a trend engineer for AMPGS even though its own Project Controls Manager pleaded for one. As AMP's agent in negotiating the multi-million dollar Hitachi contracts, Bechtel knew of the great potential harm to AMP in relying upon an untrended Indicative Target Price estimate.*

*Bechtel's argument that because it did some work under the EPC Contract, it cannot be held to have exercised no care toward AMP is factually without merit and contrary to law. The record establishes that Bechtel utterly failed to perform its multi-faceted trend obligations. Further, Ohio law is clear that compliance with some of a contract's provisions does not excuse the breach of a critical contract requirement.*

*Primary Authorities:*

*Hansel v. Creative Concrete & Masonry Constr. Co., 772 N.E.2d 138, 141 (Ohio Ct. App. 2002)*

*Wengerd v. Martin, No. 97CA0046, 1998 WL 225107, at \*2-3 (Ohio Ct. App. May 6, 1998)*

*Warren Concrete and Supply, Inc. v. Strohmeyer Contracting, Inc., No. 2010-T-0004, 2010 WL 4470724, at \*4 (Ohio Ct. App. Nov. 5, 2010)*

**F.    AMP's Claim for Damages is Based on a Well-Established Theory of Reliance Damages and is Fully Supported by the Record .............................40**

> **1.    AMP's Reliance Damages Consist of Costs AMP Incurred in Reliance on the EPC Contract ..................................................40**

*Through AMP's Rule 30(b)(6) designee, John W. Bentine, and AMP's cost construction expert, William Kime, AMP has specifically identified and documented its damage claim as the costs it incurred after January 1, 2009, the effective date of the EPC Contract, in performance of the EPC Contract including over $56 million paid to Hitachi, over $16 million paid to Bechtel, over $4 million paid to Powerspan and over $10 million in other costs which, when including pre-judgment interest, totals over $97 million.*

> **2.    AMP's Damages Are Based on a Reliance Damage Theory ...............41**

*AMP's claim for damages is based upon a well-established theory of reliance damages. AMP spent in excess of $90 million in reliance upon the EPC Contract. When a defendant has materially breached a contract, to recover reliance damages a plaintiff must prove i.) it incurred expenditures; and ii.) it incurred them in preparation for or in performance of the contract. The evidence overwhelmingly establishes that AMP did both.*

*Primary Authorities:*

*Restatement of the Law, Second, Contract §349*

*Westfed Holdings, Inc. v. United States, 52 Fed. C1. 135, 202 U.S. Claims LEXIS 70 (2002)*

*In Re Yeager Co., 227 F. Supp. 92 (N.D. Ohio 1963)*

*Some courts hold that the expenditures must have been foreseeable to the defendant. There is no factual dispute that AMP's expenditures were foreseeable to Bechtel.*

*Primary Authorities:*

*Am. Capital Corp. v. FDIC, 472 F.3d 859 (Fed. Cir. 2006)*

**3.** **Bechtel's Damages Argument Misses the Mark and is Inapplicable to Reliance Damages**..........................................................**43**

*Bechtel's damages argument attempts to create a straw man by misconstruing AMP's damages theory and by applying an erroneous causation standard. The requisite causation element for reliance damages is quite limited where a plaintiff must show that the expenses submitted as reliance damages were incurred in reliance on the contract, or that losses were sustained as a result of reliance on the contract. Here, the record is clear that AMP's reliance damages are the costs that it incurred in reliance on the EPC Contract, including specifically Bechtel's trending obligation.*

*Although AMP believes the evidence is overwhelming, at a minimum a genuine dispute of material fact exists regarding whether i.) AMP incurred expenditures, ii.) in preparation or performance of the EPC Contract, iii.) which were foreseeable to Bechtel.*

**4.** **The Cases Cited by Bechtel Are Distinguishable**..................................**46**

*The cases cited by Bechtel are expectation or restitution damages cases, which are inapplicable to and readily distinguishable from reliance damages cases.*

**5.** **Bechtel's Remaining Arguments That AMP's Damages are Speculative and That AMP Must Rule Out Other Causes of Cancellation Are Irrelevant to a Determination of Reliance Damages and Are Without Merit**..........................................................**48**

*Under a reliance theory of damages, AMP is not required to establish "what it would have done" had Bechtel advised it earlier of its skyrocketing costs on other projects. Further, AMP does not need to rule out other alleged causes of cancellation of the project. AMP only needs to establish that Bechtel breached the EPC Contract, which for purposes of its summary judgment motion Bechtel does not contest, and that AMP incurred expenditures in preparation for or performance of the contract.*

*To the extent the actions AMP might have taken if Bechtel had not breached its trending obligations or the reasons for cancellation of the project are germane to either Bechtel's breach or AMP's damages, at a minimum, a genuine dispute of material fact exists regarding those issues.*

**V.** **CONCLUSION** ..................................................................................**50**

**CERTIFICATE OF SERVICE** ................................................................**51**

## I.    INTRODUCTION

For purposes of its summary judgment motion, Bechtel concedes a genuine dispute exists regarding Bechtel's material breach of the trending provisions of its contract with AMP. Bechtel memo at p. 30, fn. 19. Instead it argues only that (1) it did not act wantonly, i.e. with no care whatsoever, and (2) that AMP's damages are speculative.

Whether Bechtel acted wantonly is an issue of fact. In addition to the myriad of evidence cited by AMP in Section IV, E, below, which supports a factual finding of wanton conduct by Bechtel, AMP submits in opposition to Bechtel's motion a Declaration and Report of a fully qualified expert who expressly opines, with full supporting documentation, that Bechtel's material breach was indeed wanton. The substantial evidence cited by AMP together with AMP's expert's opinions and the evidence cited by him in support of that opinion definitively precludes summary judgment on that issue.

Furthermore, as set forth in Section IV, A, below, since entry of this Court's May 2012 Order denying Bechtel's motion to dismiss, the Ohio Supreme Court has clarified that wanton and reckless conduct are not interchangeable. As a result, in addition to the clear evidence of Bechtel's wanton conduct, a finding of reckless conduct by Bechtel will also render the EPC Contract's limitation of liability clause unenforceable.

Bechtel's argument regarding AMP's damages is similarly misplaced. AMP's claim for damages is based upon a well-established theory of reliance damages. There is no uncertainty, indeed no factual dispute, that AMP spent over $97 million in reliance on the EPC Contract.

Finally, discovery in this case is now complete. The record consists of 30 lay witness depositions, 6 expert depositions, 880 deposition exhibits and thousands of pages of other potential exhibits not marked as deposition exhibits. From this record, Bechtel has submitted 83

exhibits that include cites to 15 deposition transcripts. AMP has submitted with this memorandum 81 exhibits that include cites to 21 deposition transcripts as well as 5 declarations.

After reviewing the voluminous evidence cited by the parties in their respective memoranda, the Court will readily conclude that genuine disputes of material fact exist with respect to AMP's claims, that summary judgment is not warranted by the record in this case and that AMP is entitled to its day in Court.

## II.    STATEMENT OF FACTS

### A.    Background

In its May 8, 2012 Opinion and Order (the "2012 Order"), the Court set forth the basic background facts underlying this dispute, including the parties and the circumstances leading to American Municipal Power, Inc.'s ("AMP") decision to build a 960 megawatt (MW) baseload[1] coal-fired generating station in Meigs County, Ohio ("AMPGS" or the "Project").[2]

AMP hired R.W. Beck, Inc. ("Beck") to provide owner engineer services for AMPGS. (Opp. Ex. 1, BECK 36590).[3] Beck performed feasibility studies, developed long-term power supply plans and power cost projections for AMP's members, assisted AMP in issuing a request for proposals ("RFP"), and served as AMP's representative in dealing with Bechtel on AMPGS. (Opp. Ex. 1, BECK 36553, 36602-606)

---

[1] Baseload power plants are generally large scale facilities that operate 24 hours per day and generate a steady quantity of power regardless of demand fluctuations. Intermediate power plants may operate for extended periods of time but generally not 24/7. Peaking power plants operate primarily when power use is at its peak. (Opp. Ex. 43, OH005576).

[2] Beck's June 2007 feasibility study contains a detailed summary and history of the AMPGS project. (Opp. Ex. 1).

[3] All of the exhibits cited in this response contain an "Opp. Ex. __" reference and will be included in an appendix that will be provided to the Court at the time the record is filed in accordance with the agreed order Doc. #87. Additionally, Opp. Ex. 24; Opp. Ex. 25; Opp. Ex. 29; Opp. Ex. 70; Opp. Ex. 81 are authenticated by the Declaration of David J. Butler, Opp. Ex. 80.

B.     The RFP and Bechtel's RFP Response

AMP issued its RFP for AMPGS to four pre-qualified EPC contractors in October 2007. (Opp. Ex. 18, BECK 14437H.0007)  At that time, Bechtel's "proposed workload . . . was very high" and it "did not have the resources available to comply with" the RFP.  (Opp. Ex. 2, p. 1). Unknown to AMP, Bechtel decided to spend a minimal amount of time and effort to prepare a non-conforming response to the RFP solely to try and "keep [Bechtel] in the game."  Id.

During December 2007, Dwight Douglass, Bechtel's Estimator, prepared four parametric estimates titled "Market Pricing Analyses" based on four "similar" power projects that Bechtel had constructed or was constructing: Prairie State Generating Company in Illinois ("Prairie State"); Millmerran Power Station in Queensland, Australia ("Millmerran"); and two units at the Springerville Generating Station project in Arizona ("Springerville 3" and "Springerville 4"). (Opp. Ex. 3).[4]  Bechtel never disclosed these Market Pricing Analyses to AMP, which only obtained them during discovery.  Bechtel prepared the parametric estimates from those projects and then calculated (by extrapolation) an Indicative Target Price for AMPGS of $1.945 Billion based on Millmerran; $2.199 Billion based on Prairie State; $2.327 Billion based on Springerville 3; and $2.384 Billion based on Springerville 4.  Id.  Bechtel then "re-did" a parametric estimate based on Prairie State and reduced its craft labor estimate by some $200 million, thereby reducing its Indicative Target Price to $1.970 Billion.  In January 2008, Bechtel submitted a proposed Indicative Target Price of $1.97 Billion in its RFP Response that AMP accepted in good faith.  AMP was never told that Bechtel's December 2007 estimates ranged as high as $2.384 Billion.  (Opp. Ex. 4, p. 240-41, 244-45).

---

[4] A parametric estimate is based on a comparison of similar projects and factored by various means. (Opp. Ex. 37, p. 11).  Opp. Ex. 37 is the expert report of William Schwartzkopf.  Mr. Schwartzkopf also issued a Declaration, which is Opp. Ex. 77.

While Bechtel spent minimal time and money preparing its RFP Response, it clearly touted its abilities, experience and confidence in its Indicative Target Price.  Bechtel claimed that it was "in a unique position to provide a tremendous benefit" to AMP because it would "leverag[e] Prairie State, and the other suite of projects currently in execution and development" and "infuse lessons learned" from those projects into AMPGS. (Opp. Ex. 5, p. 2). Bechtel's theme that it would use its experience on "Springerville 3, Elm Road, Sandow, Trimble County" and Prairie State was its dominant selling point.  (Id., p. 3). (Opp. Ex. 6, p. 1-4; Opp. Ex. 7, p. 54). It claimed that "Prairie State and our other recent experience…allow Bechtel to provide you with superior performance and a high certainty of outcome." (Opp. Ex. 5, p. 3).

Bechtel stated that its proposed Indicative Target Price of $1.97 Billion was based on "a similar two-unit project currently in execution" to which "appropriate scope adjustments" had been made, escalation "to a current day basis" had been applied and included appropriate equipment and material pricing.  It claimed that its Indicative Target Price was based upon Bechtel's "historical databases for craft job hours" that it used "to develop the construction costs." (Id., p. 39).

In response to AMP's plan to use Powerspan's air-quality-control technology, Bechtel's RFP Response boasted of its experience in building power plants with "emerging technologies." (Id., p. 57-60).  Indeed, Bechtel represented that its "experience in emerging technologies has included two commercial integrated gasification combined cycle (IGCC) plants…Bechtel is also actively participating in $CO_2$ capture and sequestration study projects and project development." (Id., p. 57-59). Contrary to Bechtel's effort in its Memorandum to distance itself from the use of Powerspan, it told AMP: "AMP-Ohio has taken a leadership position within the industry by

4

announcing the intent to use Powerspan for the AMPGS project. Bechtel understands and supports that commitment. . . ." (Opp. Ex. 5, p. 2 of 3).

Finally, Bechtel trumpeted its ability to control costs throughout AMPGS:

Cost control activities for the AMPGS will be performed consistent with processes and procedures that Bechtel has used on all its power projects . . . . As the project evolves, costs for specific items will be continuously monitored at a detailed level compared to the budget. If a cost for a detailed cost category is projected to be either above or below the budget, it will be reviewed with Bechtel and AMP-Ohio management and appropriate action will be taken. (Id., p. 85).

## C.    AMP's Response to Bechtel's Proposal

In January 2008, Beck asked Bechtel for its "level of confidence" in its $1.97 Billion Indicative Target Price. (Opp. Ex. 8). Bechtel responded as follows:

In evaluating our confidence level in the indicative target price estimate, as we discussed at the meeting, we would suggest that a 5% contingency be applied to the total target price for the project. **We then would characterize the overall estimate (total target price plus contingency), as within a -5% / +10% accuracy.** (Opp. Ex. 9) (emphasis added).

Applying this level of confidence to the $1.97 Billion Indicative Target Price provided to AMP yields a price that was less than several of Bechtel's four parametric estimates. In other words, Bechtel knew from the beginning that even at the top end of its confidence level, the Indicative Target Price it provided to AMP was essentially a sham.

In mid-February 2008, Bechtel made a formal presentation of its RFP Response to AMP and Beck. Bechtel stated that its $1.97 Billion Indicative Target Price was "scaled from actual plants based on historical experience" and that craft labor was "based on productivity on other recent plants in the region and compared to actual projects." (Opp. Ex. 7, p. 54). Bechtel's statements were misleading at best, if not an outright falsehood, since Douglass' review of "historical data" consisted of only two "scattergrams." (Opp. Ex. 4, p. 56-58; Opp. Ex. 10, p. 115-16; Opp. Ex. 11; Op. Ex. 12). At the formal presentation, Bechtel's Glenn Wagner

5

emphasized "elements to success," including Bechtel's early implementation of its project controls systems and tools to "**eliminate surprises**."  (Opp. Ex. 7) (emphasis added).

On March 17, 2008, AMP's CEO, Marc Gerken and the President of Bechtel Power's Fossil Line, Ian Copeland, met to discuss an updated Bechtel proposal of $1.994 Billion that included costs for the Powerspan technology.  Gerken raised several concerns, key among them was the concern of "driving prices down."  (Opp. Ex. 13). Copeland reiterated Bechtel's "high level of confidence" in its Indicative Target Price and stated that Bechtel "believed we could meet or beat it." (Opp. Ex. 14, p. 108; Opp. Ex. 13).

This message resonated with AMP, who from day one had informed Bechtel that EPC cost was the "most critical" concern of AMP.  (Opp. Ex. 15 "Gerken … stressed that the most critical aspect going forward is capex approval by the members.").  Bechtel repeatedly assured AMP that the Indicative Target Price estimate it provided was accurate and could be relied upon by AMP.  (Opp. Ex. 16; Opp. Ex. 17).

On March 19, 2008, based on Bechtel's submissions, presentation and representations, Beck recommended that AMP select Bechtel as the EPC Contractor for AMPGS.  (Opp. Ex. 18; §4). A key factor in Beck's recommendation was that Bechtel's "evaluated indicative price was the lowest of all three proposals." (Id., p. ES-5).  On April 3, 2008 AMP notified Bechtel that it wanted to begin negotiating an EPC contract.  (Opp. Ex. 2; Opp. Ex. 19).

**D.      Summer and Fall of 2008**

As AMP and Bechtel discussed a possible EPC contract, Gerken repeatedly told Bechtel that the EPC Costs were critically important to AMPGS's viability.  (Opp. Ex. 20, p. 110). Gerken spoke with Copeland, who reported that Gerken was **"very concerned with slips and swings in the indicative pricing."** (Opp. Ex. 21). Copeland further quoted Gerken as saying,

"this deal could survive permitting, the inevitable legal challenges to that, and ultimately building before/through financing (and to some extent permitting) **but it could <u>not</u> survive big increases in pricing.**" (Id.) (emphasis added).

Soon afterwards, Lee Lushbaugh replaced Copeland as president of Bechtel Power's Fossil Line. Gerken immediately "made it very clear" to Lushbaugh that AMPGS had only a 50-50 chance of going forward and that AMP's primary concern was price. (Opp. Ex. 20, p. 111-12).

Due to these serious concerns, AMP asked Bechtel to update its Indicative Target Price in early August 2008. (Opp. Ex. 22, p. 166; Opp. Ex. 23). In an August 11th letter, Jarrett Cantrell, a Bechtel Business Development Manager, transmitted an updated, increased Indicative Target Price of $2.318 Billion. Bechtel explained that the increase was primarily due to "global escalation" and $45-85 million in added scope items. (Opp. Ex. 23, p. 2-3). But Cantrell assured AMP that "during the Preliminary Service Phase, Bechtel will continue to work with AMP-Ohio to find the best solutions in this challenging market for both cost and schedule. . . ." (Opp. Ex. 23, p. 4).

Unknown to AMP, while Bechtel was externally giving AMP multiple assurances regarding the Indicative Target Price, internal Bechtel emails show that Bechtel was indifferent, at best, to AMP's EPC cost concerns. Opp. Ex. 24 is an internal Bechtel email chain regarding a draft agenda for an upcoming meeting between Bechtel and AMP. In one of the July 30, 2008 emails, Rondal Tobler, Bechtel's Manager of Business Development, tells the group:

> Do not start off my [sic] telling them we didn't really do a thorough job before, that there are potentially lots more things we never told them about lurking out there. They'll just see that as a signal we're going to continue to bump up the Target Price. Moreover, don't flag the problem with words on the Agenda, . [sic] **We are still selling here**. (Opp. Ex. 24) (emphasis added).

"We are still selling here" quite simply means that Bechtel was in the process of trying to induce AMP to enter into an EPC contract and did not want to tell AMP that "there are potentially lots more things we never told them about lurking out there." (Id.)

Opp. Ex. 25 is a July 10-13, 2008 internal Bechtel email chain between Tobler, Jarrett Cantrell, Todd Whorten and Martyn Daw regarding "Deal Points" for Bechtel's negotiations with AMP. At page BPC-E-01624408, one of the Bechtel personnel, in discussing whether to suggest a minimum fee, asks: "Do we set it based on the indicative, which we think is low, or set it based on a higher value, and telegraph now before we start the open book that the number is going up." (Id.). The "open book" is the process by which Bechtel was to develop the target price.

Unaware that Bechtel was already contemplating even greater increases in its Indicative Target Price, Gerken spoke to Copeland about Bechtel's updated estimate.  Gerken told Copeland that he "thought his members would balk at this and that the job had a 50/50 chance of going forward at best . . . ." and took issue with Bechtel having used "$300 million in escalation before the job starts." (Opp. Ex. 26). In a subsequent call with Lushbaugh, Gerken reiterated that keeping AMPGS's cost down was absolutely critical for it to go forward. (Opp. Ex. 72). Lushbaugh would later admit that Gerken had **"made clear to me on multiple occasions that the cost was critical."** (Opp. Ex. 20, p. 110) (emphasis added).

In the Fall of 2008, Beck updated its feasibility study to incorporate the new EPC costs provided by Bechtel.  (Opp. Ex. 27, attachment 1). In addition, a second consulting company, Burns & Roe, hired by AMP to separately advise the Participants in the Project, also issued a report on AMPGS, based in part on Bechtel's August 2008 updated EPC indicative price cost estimate. (Opp. Ex. 28). Finally, an AMPGS Participants meeting was held on October 30, 2008

where the Participants decided to authorize AMP to begin negotiating an EPC contract with Bechtel. (Opp. Ex. 52, p. 179-80).

###### E.    The EPC Contract

By December 2008, AMP and Bechtel had agreed on the business and contractual terms of an EPC Contract.  Before it could execute the contract, Bechtel's project team had to first obtain approval from Bechtel's senior management.  In late December 2008, Bechtel's senior management was particularly concerned about the basis of the Indicative Target Price and its relationship to Bechtel's actual experience on other similar projects such as Elm Road and Trimble.  (Opp. Ex. 30). Bechtel's project team, led by Tobler, in pertinent part, responded to those concerns as follows:

> Once we generate a bottoms-up estimate during the development process, we will produce a detailed comparison to the actual numbers from Prairie State, as well as the then-current forecast experience on Elm Road, Trimble and other relevant projects. **During the development process, <u>and before we deliver the Target Cost, we will also provide trends based on our current project experience,</u> with a particular emphasis on Prairie State given AMP-O**. (Id.) (emphasis added).

In contrast to Bechtel's statements in its Memorandum regarding its trend obligations, in that answer the Bechtel project team confirmed that it would provide specific trends based on Bechtel's current experience on its other similar projects, including Prairie State, Elm Road and Trimble <u>before</u> it delivered a Target Price on AMPGS.

In its Memorandum, Bechtel stresses that the EPC Contract included a "target price," not a fixed price, and that, as a result, AMP knowingly undertook risks, including the risk that AMP would likely spend millions of dollars on Bechtel and other expenses under the EPC Contract, including hundreds of millions of dollars on major equipment, before the target price would be established. (Bechtel MSJ, p. 8-9). What Bechtel fails to tell the Court, however, is that in order to mitigate these substantial risks, the EPC Contract expressly required Bechtel to diligently

undertake a multifaceted trend program that would regularly and promptly advise AMP of potential cost and schedule impacts to the Indicative Target Price on a real time basis beginning on the January 1, 2009 Effective Date.  (Opp. Ex. 31, App. V, p. 12). Bechtel's trend program was the critical, agreed upon way to spare AMP the surprise of finding out "too late" that Bechtel's Indicative Target Price was not a reliable barometer of the expected EPC Cost.

The EPC Contract broadly defined Bechtel's "Work" as including "all acts or actions required by the Agreement."  By definition, Bechtel's "Work" included its multifaceted trend obligations. (Opp. Ex. 31, ¶ 2.2).  Significantly, EPC Contract, Section 2.2 required that Bechtel perform all its "Work," including its multifaceted trend obligations, "in accordance with Professional Standards" defined as "those standards and practices used by, and the degree of skill and judgment exercised by, recognized United States engineering and/or construction firms, when performing **high quality services** on power plants similar to the Facility . . . ." (Id., ¶ 1.1) (emphasis added).

In addition to Bechtel's other responsibilities (i.e. estimating), the EPC Contract included a trend provision that expressly stated Bechtel's trend obligations:

> During the **early stages of the Preliminary Phase**, Contractor will begin **implementation of a formal trend program** which will, among other things, **provide timely identification of potential developments (i.e., "trends") that may introduce cost and/or schedule impacts (or savings) to the current estimate basis so that AMP-Ohio and Contractor can fully evaluate and consider these developments before incorporating them into the project scope and/or execution plan.  As trends are identified they will be documented and reviewed with the AMP-Ohio team members on a periodic basis but not less than monthly**. (Id., App. V, p. 12) (emphasis added).

That multifaceted trend provision contained the following six components: (i) beginning on the January 1, 2009 Effective Date; (ii) implement a formal trend program; (iii) provide timely identification of potential developments that may introduce cost and schedule impacts to; (iv) the "current estimate basis," i.e., the Indicative Target Price; (v) so that AMP could fully evaluate

and consider these developments before they became a part of the Project; and (vi) timely and regularly report them to AMP.[5] (Opp. Ex. 32; Opp. Ex. 30; Opp. Ex. 33, p. 292).

Bechtel's Project Controls Department Procedure for its Trend Program sets forth in great detail the purposes of Bechtel's contractual trend obligations and the procedures for implementing it. (Opp. Ex. 34). In pertinent part, Bechtel's trend procedure requires that it: (i) implement the trend program "immediately upon project award;" (ii) assign a dedicated trend engineer to the project; (iii) conduct regular trend meetings with the Owner to review and discuss trends; (iv) obtain active Owner participation; (v) maintain trend summaries and a trend register; and most importantly (vi) identify and report "any deviations from the trend base" because "all" potential cost and schedule impacts on cost reimbursable contracts like the AMPGS contract "affect cost to the client." (Opp. Ex. 34, p. 3, 5, 6, 7, 11, 12).

The EPC Contract also required Bechtel to act as AMP's authorized representative on purchases of equipment and materials identified in Appendix G and those with cancellation exposure of more than $1 million. (Opp. Ex. 31, ¶ 2.2.20, App. G). Bechtel significantly downplays its "Agency" role in its Memorandum, telling the Court that Bechtel was to "assist" AMP with respect to those contracts. (Bechtel MSJ, p. 11). To the contrary, Bechtel was to conduct "the procurement process for the Agency Contracts on behalf of AMP" and then "administer" those Agency Contracts, including, but not limited to, "maintaining all books, records and written communications regarding the Agency Contracts. (Opp. Ex. 31, ¶ 2.2.20). Significant to Bechtel's pending motion, Bechtel played a major role as AMP's agent on purchases of hundreds of millions of dollars from Hitachi for the Project's boilers and

---

[5] Section 1.1 of the EPC Contract defines the term Preliminary Phase as "the period between the Effective Date to and until the day prior to the Commencement Date." Section 1.1 defines Effective Date as it "the meaning set forth in the first sentence of this Agreement" which is "the 1st day of January, 2009."

generators, and formally recommended that AMP execute the Hitachi purchase orders for that equipment in May 2009. (Opp. Ex. 63).

> ### F. Bechtel's Extensive Historical and Contemporaneous Cost Records and Data on Bechtel's "Similar" Projects

Bechtel maintains a very extensive detailed database and library of reports and records of actual costs for its completed projects and ongoing projects before, during and after AMPGS. ("Bechtel Cost Records"). (Opp. Ex. 35, p. 74-86; Opp. Ex. 36, p. 29-30; Opp. Ex. 37, p. 5). This extensive complement of data, reports, and records includes detailed historical cost data on actual costs incurred on completed projects. (Opp. Ex. 37, p. 5-30). Bechtel Cost Records also include detailed cost records for the projects then underway. (Id.) At all relevant times, Bechtel possessed extensive records of actual costs for the projects that it represented to AMP were similar to AMPGS.[6] (Id., p. 1-30).

Bechtel Cost Records include data produced from extensive project controls, construction and procurement cost data. (Id., p. 5-6). Bechtel Cost Records also include reports for each specific project such as Engineering Progress and Performance Reports ("EPPRs"), Quantity Unit Rate Reports ("QURRS"), Project Financial Status Reports ("PFSRs"),[7] Cost and Commitments Reports ("CCRs"), Cost Reports ("CRs"), Historical Cost Reports ("HCRs"),[8] Professional Services Reports ("PSRs"), Trend Reports, and Forecasts. (Id., p. 6-8). Bechtel personnel, including Bechtel's AMPGS team, could easily access those records. (Opp. Ex. 35, p. 74-86; Opp. Ex. 68, p. 32-36; Opp. Ex. 22, p. 215-18; Opp. Ex. 40, p. 258-59). Indeed, an Estimating Historian maintained all historical cost reports in a library in Frederick, Maryland and

---

[6] Bechtel represented that those projects were Elm Road, Trimble, Springerville 3, Springerville 4, Sandow, Prairie State, and Sammis. (Opp. Ex. 5; Opp. Ex. 6; Opp. Ex. 38).

[7] Bechtel regularly issues PSFRs and provides the project's financial status as well as reasons for positive or negative changes thereto and commentary. (Id., p. 7).

[8] Bechtel assembles HCRs, which include the as-built schedule, final QURR, changes to the project's scope, a log of all trends, a final CR and other reports, for historical purposes at the end of a project.

there are computer databases of all Bechtel cost records that Bechtel personnel could easily access.  (Opp. Ex. 36, p. 16-17; Opp. Ex. 35, p. 73-85).

Bechtel's project teams also create Forecasts that report on a project's costs and forecast future developments.  Bechtel management reviews the detailed Forecasts and uses them to adjust project budgets. (Opp. Ex. 37, p. 8). During AMPGS, Bechtel Forecasts included Elm Road Forecast Number 3, dated December 2008; Prairie State Forecast Number 1, dated April 21, 2009; and Trimble Forecast Number 2, dated June 25, 2009.  (Id., p. 25-26, 30-31, 36-38, 44-53, 56-64).  Each Forecast contained extensive data and analysis of Bechtel's performance to date and detailed forecasts and budget adjustments for the future.  (Id.)  Significantly, each Forecast reported that Bechtel's costs were dramatically increasing on its similar projects. (Opp. Ex. 37, p. 25-26, 30-31, 36-38, 44-53).

Bechtel's AMPGS team had ready access to Bechtel's Cost Records.  In fact, key members of Bechtel's AMPGS team including, Greg Wagner and Todd Whorten, actually had critical cost data from similar projects in their possession.  (*See, e.g.*, Opp. Ex. 39, p. 58-68; Opp. Ex. 22, p. 156, 215-18, 236; Opp. Ex. 40, p. 32-33, 170, 258-59).

Bechtel's Cost Records show that from January to November 2009, it was experiencing significantly worse craft labor productivity and substantial cost increases for Bechtel's craft labor, field non-manual, distributables and home office expenses on similar projects. (Opp. Ex. 37, p. 25-64). Those records also show that Bechtel's costs on Elm Road, Prairie State, Trimble, and Sandow had increased significantly and were forecasted to continue to increase. (Id.).

Bechtel absolutely knew that the actual costs of constructing the power projects that it represented to AMP as similar projects had increased dramatically from its estimates. Bechtel issued numerous internal reports analyzing those critical cost impacts and increasing its

13

forecasts, but Bechtel never reported them to AMP and never trended the Indicative Target Price with these potential cost impacts. (Id., p. 26). In addition to AMP's cost construction expert Schwartzkopf, AMP also submits in opposition to Bechtel's motion the Declaration of Ivan Clark, Beck's primary representative on the AMPGS project. (Opp. Ex. 79). As Clark makes clear, Beck and AMP were never made aware of the dramatic, actual cost increases Bechtel was experiencing on other similar projects.

> **G.     January 2009 – May 1, 2009**

The EPC Contract's Preliminary Phase began on January 1, 2009, (Opp. Ex. 31, p. 1) (also defined in Section 1.1).  On February 9, 2009, the parties held a "kick-off" meeting that representatives from Bechtel, AMP and Beck attended by telephone.  In response to a question from Beck on how it and AMP could stay abreast of the development of the Target Price, Bechtel stated that the Project's trend program is intended to "be the primary tool by which the Project will track impacts to the Target Price."  Bechtel stated that at that very early state, the trend program "currently" consisted "primarily" but not exclusively, of the scope items in Appendix T-3 Attachment 1.  (Opp. Ex. 41).

In its Memorandum, Bechtel contends that the minutes of the February 9, 2009 kick-off meeting reflect an "Agreed-Upon Plan" that limited Bechtel's trend obligation to scope items. (Bechtel MSJ, p. 14, 17). The record clearly shows otherwise.  Bechtel did not state nor did AMP agree that the Preliminary Phase trend program was to be limited exclusively to Appendix T-3 scope items. (Opp. Ex. 41; Opp. Ex. 42, p. 128). To the contrary, AMP and Beck fully expected that Bechtel would regularly trend the Indicative Target Price with all potential cost and schedule impacts, including current experience on its similar projects as required by the EPC Contract's

trend provisions (Opp. Ex. 31, App. V, p. 12) and by Professional Standards and industry standards. (Opp. Ex. 37, p. 26, 65).

Bechtel's characterization of the February 9, 2009 kick-off meeting is contradicted by its own documents. Immediately following the meeting, Randy McCarraher, Bechtel's Project Controls Manager,[9] reiterated AMP's stated desire to commence the regular trend review process and emphasized the need for Bechtel to immediately assign a full-time trend engineer to the project:

> We had a kick-off meeting with our owner on AMP this afternoon and one of the items the Owner discussed was our trend program. **They indicated they wanted to start regular meetings to review trends on the job so they could get an early handle on where costs were going.** They did not set a specific date for the first meeting but it will occur in the next 4-6 weeks.
>
> **That said, without a trend engineer the first meeting has the potential to be pretty embarrassing for us as we have little more than what the owner saw during the development period back in September. I really could use some help on this one considering Tony Brower was re-routed to Trimble before he could get started. For the record, this needs to be a fulltime resource.**

(Opp. Ex. 70) (emphasis added).

Bechtel never assigned a full-time trend engineer to AMPGS. (Opp. Ex. 40, p. 136-137; Opp. Ex. 35, p. 48).

At a minimum, for purposes of Bechtel's motion, a **genuine dispute of material facts exists regarding what occurred at the February 9, 2009 kick-off meeting.**

In April 2009, Bechtel's Project Controls Manager Glenn Wagner gave a detailed PowerPoint presentation explaining Bechtel's Project Controls Plan for AMPGS. In multiple slides, Wagner discussed details of Bechtel's trend program for AMPGS. (Opp. Ex. 44, p. 33-37). He defined a "trend" as "a potential item of change that causes an addition to or reduction in cost." (Id., p. 34). He set forth different types of trends that Bechtel would trend. In addition to

---

[9] Randy McCarraher was Project Controls Manager until April 2009. (Opp. Ex. 40, p. 56-57; Opp. Ex. 22, p. 58-59).

scope trends, he stated that Bechtel would trend "**Other Trends**" defined as "items that cannot be classified as scope changes, but are attributable to project evolution" such as "Pricing; Quantity Fluctuations; Design Changes;" and "Productivity." (Id., p. 35). He also highlighted the "Key Trend Program Attributes" as "Baseline in place; Early Identification; Informed Decision Making; Timely Decision Making;" and "NO SURPRISES." (Id., p. 36) (emphasis in original). As events unfolded, Bechtel <u>never</u> did what it said it would do, ultimately resulting in AMP being on the receiving end of Bechtel's $1 Billion late October 2009 surprise.

### H.    May 2009

During the April 2009 monthly meeting, Beck's Clark discussed with Bechtel the need for an update to the Indicative Target Price for AMP's upcoming project review with the AMPGS Participants. (Opp. Ex. 42, p. 144). On May 1, 2009, Clark specifically requested an updated Indicative Target Price from Bechtel's Project Manager, Todd Whorten, as follows:

> Todd,
>
> **As you know we are preparing updated modeling for the AMPGS feasibility as part of the plan for the AMPGS participants approval to move ahead with award of the turbine and boiler**.  Due to significant changes on the current and near term power market, the AMPGS project is less beneficial to the participants as compared to our earlier projections.  **In preparing new projections we have relied on Bechtel's previous capital cost estimate (August 2008),** but have adjusted (increased) Powerspan cost for the 1ppm plan and we have adjusted (reduced) estimated escalation. All other costs have not been changed.  As a result, we project only a modest decrease in the capital based on the reduced escalation.  **AMP-Ohio is concerned that the current capital cost estimates do not fully reflect market conditions** and is unfairly representing the project as compared to the power market projections. **They are honestly concerned that the Project may not move forward. For this reason, we would like to spend a day or two next week with your costs people to better define our best guess on the capital costs**.

(Opp. Ex. 45) (emphasis added).

That same day, Gerken conveyed a similar request to Lushbaugh.  (Opp. Ex. 20, p. 146-50; see also, Opp. Ex. 46).  Lushbaugh told Gerken that Bechtel would "meet with them . . . and

that we would do our best." (Opp. Ex. 46). Lushbaugh recognized the importance of this update, knew that Gerken was going to present Bechtel's updated Indicative Target Price "to his various boards and committees" deciding whether AMPGS would go forward and "had no intention of giving him a number that wasn't reliable." (Opp. Ex. 20, p. 150-51).

At the same time, Bechtel, acting as AMP's agent in the procurement of major equipment for AMPGS, was negotiating the potential procurement of AMPGS's boilers and generators that would cost hundreds of millions of dollars and was meeting with Beck, AMP and Hitachi in Bechtel's Frederick, Maryland offices.  (Opp. Ex. 42, p. 184-85).

In response to Clark's May 1st request, Beck and Bechtel met on May 5 at Bechtel's office.  The Bechtel representatives reviewed a draft spreadsheet with Beck and said that they would further refine it over the next few days.  (Opp. Ex. 42, p. 200, 201-02, 212-13). On May 8th, Cantrell, who unbeknownst to AMP and Beck was no longer even assigned to AMPGS, emailed Clark a "working spreadsheet" reviewed by Bechtel's management:

> Attached is the working spreadsheet that we reviewed earlier this week.  **During our review with our management team, we tweaked some of the details a bit to reflect <u>some decline since August,</u> but we <u>held the bottom line the same</u> by adjusting to go escalation upwards**.  The three areas of uncertainty are material handling, barge unloading, and craft labor and **we are hoping to be able to provide an <u>update early next week</u> on those items . . . .**

(Opp. Ex. 47, emphasis added; Opp. Ex. 10, p. 34-36, 287).

The spreadsheet reflected Bechtel's confidence in its Indicative Target Price as of May 2009, which had **decreased** slightly from its August 2008 Indicative Target Price.  Bechtel's updated Indicative Target Price was now $2.263 Billion versus its August 2008 update of $2.273 Billion. (Opp. Ex. 47).

Significantly, Bechtel's May 2009 update (i) held the cost of craft labor at $459,000,000 while indicating that this item was "under review"; (ii) reduced its distributable cost from

$81,000,000 to $74,100,000; (iii) indicated that field non manual cost was unchanged at $140,000,000 vs. $143,550,000; and (iv) its Home Office cost was also unchanged at $75,000,000 vs. $76,850,000. Bechtel never provided the promised updated information. (Opp. Ex. 10, p. 297-98).

Unbeknownst to Beck and AMP, Bechtel and virtually all of its AMPGS project team had **actual** knowledge of, and easy access to, Bechtel's extensive historical and contemporaneous cost records discussed above which, if used as required to trend the "current estimate basis", i.e., the Indicative Target Price, would have revealed that Bechtel's Indicative Target Price grossly understated the estimated EPC costs for AMPGS. (S*ee, e.g.*, Opp. Ex. 39, p. 58-68; Opp. Ex. 22, p. 215-18, 236-42; Opp. Ex. 40, p. 32-33; Opp. Ex. 37, p. 31-35).

Bechtel downplays the significance of the May meeting and its May efforts over a week's time to update its Indicative Target Price. (Bechtel MSJ, p. 23). ("The meeting lasted a few hours and no notes or minutes of the meeting were kept.") While AMP asserts that Bechtel was fully aware of the critical importance of its May updated Indicative Target Price, at a minimum, for purposes of Bechtel's motion, **a genuine dispute of material facts exists regarding the May meeting and Bechtel's May update**.

Rather than fulfill its trend obligations and advise AMP that Bechtel's actual experience on similar plants made it clear that its Indicative Target Price was grossly understated, in May 2009 Bechtel presented a rosy picture with its updated Indicative Target Price. Bechtel also formally recommended that AMP execute purchase orders with Hitachi for boilers and generators costing more than $400 million. (Opp. Ex. 22, p. 249-52; Opp. Ex. 48; Opp. Ex. 49). Bechtel fully understood that those purchase orders contained significant termination payments that increased monthly once Hitachi began to manufacture the equipment.

Following receipt of Bechtel's May updated Indicative Target Price, Beck prepared an updated AMPGS feasibility analysis dated May 20, 2009. (Opp. Ex. 50). Beck's analysis was based on Bechtel's updated Indicative Target Price and determined that AMPGS's costs continued to be in line with Bechtel's October 2008 updated Indicative Target Price. (Opp. Ex. 50, p. 6[10], 12). A presentation was made to AMPGS Participants at a May 28, 2009 meeting and they voted to authorize AMP to move forward with AMPGS by executing land options, proceeding with major equipment purchases (boilers and generators) and commencing early construction. (Opp. Ex. 51, p. 71).

## I.      June – November 2009

Negotiations with Hitachi for the purchase of the boilers and generators were finalized in the summer of 2009. (Opp. Ex. 52, p. 185). In addition, AMP exercised options for the purchase of land on which the plant would be built. (Opp. Ex. 53, No. 18, Ex. 5). Thereafter, Bechtel began early site work and started construction.

As before, during the summer of 2009, Bechtel failed to trend its Indicative Target Price in accordance with its contractual obligations, its Corporate Trend Procedure, Professional Standards and industry standards. (Opp. Ex. 31, App. V, p. 12; Opp. Ex. 34; Opp. Ex. 37, p. 65). It never advised AMP of the very substantial cost impacts that were obvious from its proprietary cost data on its similar projects. (Opp. Ex. 22, p. 218-19, 236-42; Opp. Ex. 39, p. 161, 176, 180; Opp. Ex. 37, p. 33-35, 37-38, 41, 51, 61, 65).

As a result of Bechtel's failure to meet its trend obligations, the inevitable happened. As stated by AMP's Gerken, on October 30, 2009 "Bechtel dropped me with a billion dollar bomb." (Opp. Ex. 14, p. 197). On that day, Lushbaugh spoke to Gerken and told him that the number

---

[10] Beck's reporting of the AMPGS Project Costs the "Total EPC Cost" figure includes amounts for contingency and escalation that are not included in Bechtel's reporting of EPC costs. Accordingly, when comparing Beck's report to Bechtel's report it is important to use the "subtotal" line as opposed to the "Total EPC Costs" line.

was "somewhere around $3.3 billion;" he was not happy with that number; he had set up an internal review; and would be back in touch when Bechtel completed its internal review. (Opp. Ex. 20, p. 168-70). Gerken was outraged and demanded to know how it could be that Bechtel had just told AMP in its September report that the potential cost impacts were certain scope items totaling an estimated $239 million but were now, just a few weeks later, telling AMP that Bechtel's updated Indicative Target Price was off by $1 Billion.  (Opp. Ex. 14, p. 192-93). Gerken told Lushbaugh that he had serious concerns as to whether AMPGS could go forward with a $3 Billion Target Price.  (Id.)

Gerken subsequently asked Lushbaugh if Bechtel would agree to a lump-sum turnkey price for AMPGS of $2.95 Billion.  (Id., p. 193-94).  Gerken did so to see if Bechtel would fix its price and to see how confident Bechtel was "in the new numbers they're giving me today."  (Id., p. 194).  After conferring with Riley Bechtel, Lushbaugh told Gerken that Bechtel would not agree to a lump-sum turnkey price.  (Id., p. 193-94).  Bechtel's response indicated to Gerken that "they weren't confident at all."  (Id., p. 194).

On p. 1 of its Memorandum, Bechtel tells the Court that in November 2009 it provided a Target Price Estimate to AMP of $3.061 Billion that was "$788 million more than anticipated before Bechtel started to develop the Target Price Estimate."  Bechtel does not acknowledge the misleading nature of this initial statement until much later in its Memorandum. (Bechtel MSJ, p. 24-25). Even that recitation demonstrates, at a minimum, that **a genuine dispute of material fact exists regarding Bechtel's Billion dollar October surprise.**

There is no factual dispute that from August 2008 until May 2009, Bechtel's August 2008 updated Indicative Target Price of $2.273 Billion was the "current estimate basis" referred

to in Appendix V of the EPC Contract. Bechtel's May 2009 Indicative Target Price was $2.263 Billion, a sum $10,000,000 less than the August 2008 estimate.

When Bechtel made its November 11, 2009 formal presentation to AMP on its "Target Cost Estimate," Bechtel once again referenced the August 2008 Indicative Target Price of $2.273 Billion. (Opp. Ex. 54, p. 3). On the same page, it gave its "Current Nov 2009" estimate of $3.333 Billion.  Thus, the October 2009 surprise increase that Bechtel sprung on AMP was $1.060 Billion more than its August 2008 Indicative Target Price and $1.070 Billion more than the revised Indicative Target Price provided to AMP in May 2009. The increase was not $788 million as Bechtel claims on p.1 of its Memorandum.

When Bechtel provides its further explanation of the price increase on p. 24 of its Memorandum, it claims that "Subsequently, Bechtel conveyed to AMP its willingness to reduce its fee to reach a target cost of $3.061 Billion." What Bechtel fails to tell the Court is that it reached the $3.061 Billion number only through what Bechtel euphemistically refers to as "construction opportunities" and a reduction in a portion of its fee.  In fact, what Bechtel proposed was to reduce the scope of AMPGS. In Bechtel's November 17, 2009 presentation, it specifically refers to "Scope/Cost reduction opportunities." (Opp. Ex. 55, at p. 2). It is only through scope reductions that Bechtel was able to get the estimate to $3.119 Billion. (Id., p. 12). In other words, Bechtel is engaging in the classic game of comparing apples to oranges, not apples to apples.

Furthermore, conspicuously absent from Bechtel's recitation is the statement on p. 2 of its November 17, 2009 presentation that its recommended scope/cost reduction opportunities had been reviewed by its estimating department "**but not reviewed through Execution Unit nor Business unit.**" (Id.) (emphasis added). In other words, even at this late date, Bechtel was

presenting an estimate to AMP that had not been fully approved.  Thus, the implication in Bechtel's Memorandum that it provided AMP with a firm $3.061 Billion Target Price Estimate is clearly misleading.

At various places in its Memorandum, Bechtel also implies that the cause of its surprise billion dollar October 2009 increase to the EPC costs was limited primarily to issues with Powerspan, material handling and barge facilities.[11] (*See, e.g.*, Bechtel MSJ, p. 17-20). Bechtel specifically refers to monthly progress reports it sent to AMP in September, October and November 2009 that, respectively, reference cumulative cost increases related to 13 scope items amounting to $155.7 million, $239 million and $358 million. (Bechtel MSJ, Ex. 32, 33, 34).

Bechtel's focus on those reports is a transparent attempt to divert the Court's attention from the real issue in this case: Bechtel's wanton and reckless failure to trend and to timely report potential cost impacts to AMP starting in January 2009, before AMP committed to spending hundreds of millions of dollars for equipment, land and construction of AMPGS. Furthermore, Bechtel's recitation conspicuously ignores the actual reasons for its billion dollar increase.

When Lushbaugh called Gerken on October 30, 2009, he told Gerken that the reasons for the increase were increases in: craft labor, distributables, field non-manual, home office overhead and Powerspan. (Opp. Ex. 14, p. 192; Opp. Ex. 29). In its Memorandum, Bechtel focuses on Powerspan, but fails to mention the other four factors cited by Lushbaugh, all of which were Bechtel's responsibility.

---

[11] These potential cost increases were well known and considered.  For instance, Clark testified that Beck had set aside appropriate contingency moneys for Powerspan.  (Opp. Ex. 42, p. 64-65).

In November 2009, Bechtel prepared a "reconciliation" between its $2.273 Billion Indicative Target Price and its then Target Price Estimate of $3.284 Billion. (Opp. Ex. 56).[12] As Lushbaugh had told Gerken, but ignored in Bechtel's Memorandum, the bulk of the increase resulted from the following cost categories:

| | |
|---|---|
| Total Craft Labor - | $338,925,000 |
| Field Distributable Material | |
| and Subcontract - | $168,156,000 |
| Field Non-Manuel Labor | $140,287,000 |
| Home Office - | $ 91,068,000 |
| | |
| Total | $738,436,000 |

(Opp. Ex. 56).

Significantly, as demonstrated in the report of AMP's expert, Schwartzkopf, these are the very areas that Bechtel knew beginning in late 2008 and throughout 2009 were skyrocketing at Bechtel's similar plants. (Opp. Ex. 37, p. 29-65). Bechtel's suggestion that AMP was somehow responsible for the surprise one billion dollar increase in EPC costs in late October 2009 is utterly without merit.

During the two November presentations, AMP realized that Bechtel's new estimate was a radical departure from what Bechtel had consistently represented to AMP.  Bechtel was no longer estimating craft labor at 7,500,000 man hours at a cost of $427,500,000. (Opp. Ex. 56). Rather, it was carrying craft labor at over 14 million man hours and **at an estimated cost over $750,000,000**. (Id.). Bechtel had also radically reduced its productivity expectations for craft labor based on its actual reported experience on other similar projects, particularly Elm Road. (Opp. Ex. 58). Bechtel's estimate for field non-manual costs **soared by 96% from $161,000,000**

---

[12] Bechtel prepared other reconciliations which similarly confirmed that these four items accounted for the large majority of Bechtel's $1 Billion October surprise.  (See, e.g., Opp. Ex. 37, p. 66).

to **$316,000,000** as did its estimate for Distributables, which **increased 121% from $157,000,000 to $347,000,000**.  Its estimate for home office expense **increased 94% from $89,000,000 to $173,000,000**. (Opp. Ex. 54). Bechtel's Cost Records on similar projects had clearly reported each of these potential cost impacts internally beginning in **2008** and continuing from January 1, 2009 through November 2009.  Bechtel, however, never trended any of them on AMPGS.

On November 24, 2009, the AMPGS Participants voted to terminate AMPGS as a base-load coal-fired power plant, and AMP issued a termination notice for default to Bechtel. (Opp. Ex. 59; Opp. Ex. 60; Opp. Ex. 81). This termination occurred just one day prior to the next "step-up" in AMP's purchase orders with Hitachi that would have increased AMP's termination liability by approximately $16 million.  (Opp. Ex. 61, p. 134).

On p. 24 of its Memorandum Bechtel alleges that in November 2009, AMP decided to switch from coal to natural gas.  That allegation is demonstrably false.  AMP had long been considering building a gas-fired, intermediate level plant. (Opp. Ex. 62, p. 246-47; Opp. Ex. 66, p. 173). Contrary to Bechtel's allegations, there was no "decision" to switch the AMPGS baseload project from coal to gas.

AMPGS's termination was due solely to the $1 Billion surprise increase in Bechtel's EPC cost estimate, the lack of any protection against future price increases, and Bechtel's refusal to agree to a lump-sum turnkey contract.  (Opp. Ex. 53, No. 2). John Bentine, AMP's Rule 30(b)(6) designee, explained the reasons for the cancellation as follows:

> **I can tell you when we cancelled the project we were looking at an increased cost for the project from Bechtel that was a surprise**, and based on our -- Beck's projections at the time did not provide significant cost benefits into the future over the life of the project such that with **no guarantee that the price wasn't going to go up further because Bechtel had refused to do a fixed price contract**, with little or no confidence in Bechtel's ability to project what the cost of the project was going to be. **Was the $3.3**

**million (sic) which then became $3.1 million (sic) or vice versa going to be the real cost of the project or was it going to go up another billion dollars?** There was no confidence in the ability of Bechtel to project at that time. **So without the significant economic benefits associated with the project with no confidence in the price not going way up, no confidence that we could get a fixed price because Bechtel had said no, and still having all that construction risk out into the future, yeah, we cancelled the plan[t]** [sic].

(Opp. Ex. 61, p. 138-39) (emphasis added).

While AMP and Beck reasonably analyzed other issues potentially impacting the power and finance markets and the economy in general after Bechtel told them about the $1 Billion surprise increase in its EPC cost estimate, and moved to mitigate their damages by attempting to reconfigure the site as a new project with an intermediate facility, those factors did not cause the cancellation of AMPGS. (See, Opp. Ex. 53, No. 2; Opp. Ex. 61, p. 137-39; Opp. Ex. 42, p. 318-19; Opp. Ex. 14, p. 195-96, 202-06, 208; Opp. Ex. 64, p. 165-66; Opp. Ex. 52, p. 287-90; Opp. Ex. 62, p. 238, 291-92; Opp. Ex. 65, p. 203, 206; Opp. Ex. 66, p. 213, 237).

At a minimum, for purposes of Bechtel's motion, a **genuine dispute of material facts exists regarding the reason for the termination of the project.**

## III. THE LEGAL STANDARD FOR RULING ON A RULE 56(a) MOTION FOR SUMMARY JUDGMENT

Fed. R. Civ. P. 56(a), as amended in 2010, now provides that "(t)he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." As stated in *Gallo v. Prudential Residential Servs., Ltd. Pshp.*, 22 F.3d 1219 (2nd Cir. 1994), "[the court's] duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Id.* at 1224.

In determining whether genuine disputes exist that preclude summary judgment, the Court "must construe the evidence produced in the light most favorable to the non-moving party (AMP), drawing all justifiable inferences in (its) favor." *Electro Mechanical Corp. v. Ogan*, 9

F.3d 445, 448 (6th Cir. 1993); *See also*, *Gallo*, 22 F.3d at 1223 ("all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought.").

As discussed *infra*, Bechtel's characterization of the facts in its memorandum in support raises multiple, significant credibility issues. "It is fundamental that a judge may not make credibility determinations or otherwise weigh the evidence when ruling on a summary-judgment motion; such functions are for the finder of fact after a trial." *Nelms v. Wellington Way Apartments, LLC*, No. 11-3404, 2013 WL 408034, 6 (6th Cir. Feb. 4, 2013), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Finally, as discussed in Section IV, A, below, the central issue in this case is whether Bechtel acted wantonly or recklessly in breaching the EPC Contract with AMP. "Whether behavior constitutes reckless or wanton conduct . . . is ordinarily a factual question for a jury to decide." *Galloway v. Chesapeake Union Exempted Vill. Schs. Bd. of Educ.*, No. 1:11-cv-850, 2012 WL 5268946, at *10 (S.D.Ohio Oct. 23, 2012). While Bechtel and AMP have waived a jury trial, the Court's obligation to resolve this central factual dispute as the trier of fact requires the full exploration of a trial and renders this action unsuitable for summary judgment.

## IV.   ARGUMENT

### A.   A Limitation of Liability Clause is Rendered Unenforceable by Willful, Wanton or Reckless Conduct, Which are not Interchangeable.

This Court recognized in its 2012 Order that Ohio courts have used the terms gross negligence, recklessness, willful and wanton to describe conduct which renders a limitation of liability clause unenforceable.[13]  (2012 Order, p. 7).  The Court, however, concluded that Ohio

---

[13] See, AMP's Memo (Doc. #19), p. 3-5.  Specifically, *Transcontinental Ins. Co. v. Simplex Grinnel, LP*, No. 3:05-cv-7012, 2006 WL 2035571, *5-7 (N.D. Ohio 2006); *Nahra v. Honeywell, Inc.*, 892 F. Supp. 962, 969-70 (N.D. Ohio 1995); *Solid Gold Jewelers v. ADT Security Sys., Inc.*, 600 F. Supp.2d 956, 964 (N.D. Ohio 2007).

case law equates gross negligence and recklessness with wanton conduct. *Thompson v. McNeill*, 53 Ohio St.3d 102, 104 (1990) and *Harsh v. Lorain Cty. Speedway*, 111 Ohio App.3d 113, 118 (Ohio Ct. App. 8th Dist. 1996). As a result, this Court held that the controlling standard on enforcement of a limitation of liability clause is "whether the party that breached the contract did so intentionally or failed to exercise any care whatsoever." *Id.*

Based upon this Court's previous determination of the "controlling standard" for the enforcement of a limitation on liability clause, Bechtel focuses its entire argument on whether or not they "failed to exercise any care whatsoever." (Bechtel MSJ, p. 29, et seq.). In its Memorandum, Bechtel fails to inform the Court that subsequent to its 2012 Order, the Ohio Supreme Court held that the terms reckless, willful and wanton are not interchangeable and that each describe distinct degrees of care. *Anderson, Admr., v. City of Massillon, et al.*, 134 Ohio St.3d 380 (2011).

In *Anderson*, the Court noted that "it is not surprising that Ohio appellate courts have reached the conclusion that the willful, wanton, and reckless standards are 'functionally equivalent.'" *Id.* at ¶ 30. The Court attributed the confusion to a footnote in *Thompson*. *Id.* at ¶ 81. Recognizing that the Court's historical jurisprudence "demonstrates, willful, wanton and reckless describe different and distinct degrees of care and are not interchangeable," the Court disavowed the "dicta" in *Thompson*. *Id.* at ¶ 31 and syllabus ¶ 1.

To avoid further confusion, in its syllabus the Court defined wanton and reckless conduct:

> 3. Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result. (*Hawkins v. Ivy, 50 Ohio St.2d 114, 363 N.E.2d 367 (1977)*, approved and followed.)

4.  Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another which is unreasonable under the circumstances and substantially greater than negligent conduct.  (*2 Restatement of the Law 2d, Torts, Section 500* [**2] (1965), adopted.)

*Id.* syllabus ¶¶ 3, 4.

As is demonstrated below, Bechtel acted wantonly by failing to exercise any care with respect to its trend obligations, rendering the EPC Contract's limitation of liability clause unenforceable.  And, given the holding in *Anderson*, Bechtel errs in asserting that wanton conduct is the only standard of unenforceability of limitation of liability clauses.  Reckless conduct, characterized by the conscious disregard of or indifference to a known or obvious risk of harm, similarly will render the limitation of liability clause unenforceable.  *Id.*

### B.    The Gravamen of Plaintiff's Complaint is Bechtel's Wanton and Reckless Breach of the EPC Contract's Trend Related Provisions

AMP's claims arise from Bechtel's material breach of the EPC Contract, particularly its wanton and reckless failure to trend in accordance with the express provisions of the EPC Contract.  In its 2012 Order, this Court summarized AMP's material allegations from its Complaint and held that, if proven, they were legally sufficient to sustain a finding of Bechtel liability notwithstanding the EPC Contract's Limitation of Liability provision. (2012 Order, p. 13).

There exists substantial record evidence proving that Bechtel breached the EPC Contract by wantonly and recklessly failing to trend the Indicative Target Price. Furthermore, AMP's expert, Schwartzkopf, details Bechtel's failures to comply with the EPC Contract andhis Declaration and Report includes his fully supported opinion that, inter alia, Bechtel failed to exercise any care toward AMP with full knowledge that its failure would cause great harm to AMP.  (Opp. Ex. 37, p. 3). Whether Bechtel's conduct was wanton or reckless is an issue of fact.

*Galloway v. Chesapeake Union Exempted Vill. Schs. Bd. of Educ.*, No. 1:11-cv-850, 2012 WL 5268946 at *10 (S.D. Ohio Oct. 23, 2012).  Accordingly, at a minimum, this substantial body of evidence and Schwartzkopf's opinions and report establish **that a genuine dispute of material facts exists regarding Bechtel's wanton and/or reckless conduct precluding summary judgment.**

### C.     The EPC Contract's Trend Provisions

#### 1.     Bechtel was Contractually Obligated to Trend Potential Cost and Schedule Impacts Against the Indicative Target Price in Accordance with Professional Standards.

Bechtel was contractually obligated to timely trend potential cost and schedule impacts against the Indicative Target Price.  Specifically, the EPC Contract's trend provision, set forth in full on p. 10, *supra*, required:  (i) that from the Preliminary Phase, i.e., January 1, 2009, the Effective Date, (EPC Contract Section 1.1); (ii) Bechtel institute a formal trend program; (iii) to identify potential cost and schedule impacts to; (iv) Bechtel's then current estimate basis; (iv) and report them to AMP so that; (v) Bechtel and AMP could then consider and evaluate their meaning to the AMPGS Project.  (Opp. Ex. 31, App. V, p. 12). These trend obligations were a material part of Bechtel's "Work" as defined in EPC Contract Section 2.2 which further required that Bechtel perform its trend obligations "in accordance with Professional Standards." (Id.)

These multifaceted trend obligations were critically important to AMP because it would take approximately ten months for Bechtel to develop a Target Price Estimate.  (Id., App. V; Opp. Ex. 67). Regular reports of potential cost and schedule impacts to the Indicative Target Price were crucial for AMP's ongoing evaluation of what AMPGS would likely cost as it was making decisions about whether to commit hundreds of millions of dollars to the Project.  (Opp. Ex. 22, p. 249-52; Opp. Ex. 40, p. 131-32).

## 2.    Preliminary Phase

Bechtel's trend obligations were required to commence "during the early stages of the Preliminary Phase." (Opp. Ex. 31, App. V., p. 12).  Preliminary Phase was defined in Section 1.1 as the "period from the Effective Date to and until the Day prior to the Commencement Date". (Opp. Ex. 31).  Effective Date was defined as January 1, 2009.  (Id., p. 1).  Thus, Bechtel's trend obligations began virtually immediately upon execution of the EPC Contract.

This timing is consistent with Bechtel's corporate Project Controls Department Procedure, Trend Program (Opp. Ex. 34) ("Bechtel's Corporate Trend Procedure") which states that  "(t)he trend program starts immediately upon project award with the establishment of a trend baseline for identification of budget variations and deviations based on the contract scope, cost and schedule" and "(i)mmediately after the award of a project, the project controls team will review the cost and schedule control budget established for the trend program with the client." (Id., p. 5, 11) (emphasis added).  This timing is critical in making certain that the trend program fulfills its purposes of assuring "no surprises" and acting as an "early warning system."  (Opp. Ex. 68, p. 100-101; Opp. Ex. 69, p. 234).

## 3.    Formal Trend Program

The EPC Contract required Bechtel to implement a "formal" trend program, which is typically given a high priority.  (Opp. Ex. 35, p. 35). Bechtel's Corporate Trend Procedure specifies the program's required characteristics and required Bechtel to: (i) assign a dedicated Trend Engineer; (ii) identify numerous types of trends; (iii) conduct regular trend meetings with the Owner to review and discuss identified trends; (iv) obtain active owner participation; (v) maintain trend summaries and a trend register; and (vi) maintain specific forms for trend summaries and registers. (Opp. Ex. 34, p. 3-5, 6, 8-10, 11, 12, 13-14).

### 4.    Identification of Potential Cost and Schedule Impacts

Bechtel was required to trend "potential cost and schedule impacts."  While Bechtel now contends (Bechtel MSJ, p. 17) this was limited to scope items only, the record evidence clearly demonstrates otherwise.  As Bechtel's Dwight Douglass testified, "[t]he intent of the trend report is to document either real or potential things that could impact cost and schedule."  (Opp. Ex. 4, p. 75).

Bechtel's Corporate Trend Procedure requires the identification of "<u>any</u> deviations from the trend base." (Opp. Ex. 34, p. 6-7). It further states in Section 4.4:

> To maximize project control <u>all possible budget deviations</u> must be identified quickly and singly, so that corrective action can be taken and cost and schedule surprises can be avoided. Therefore, the trend process is not concerned with the preciseness of estimates or with quantitative back up. (Id.) (emphasis added).

This Corporate Trend Procedure further specifically emphasizes the importance of identifying <u>all</u> potential cost or schedule impacts on cost-reimbursable contracts such as the AMPGS EPC Contract because "(o)n cost-reimbursable projects, **all** trends affect cost to the client…." (Id., p. 7) (emphasis added).

Bechtel's Corporate Trend Procedure lists over twenty items that must be trended including, for example, labor productivity, home office productivity and wage rates, quantities, distributables, non-manual labor staffing, equipment, materials and many other items. (Id.).  It requires trending of "Non-scope change Trends" and "Trends, Other" such as pricing, quantity fluctuation, labor productivity and other developments. (Id., p. 16).

In stark contrast to Bechtel's current position that the Preliminary Phase trend program was limited to scope items, the evidence clearly proves otherwise.  As discussed at p. 9, supra, prior to entering into the EPC Contract, as part of Bechtel's senior management contract approval process,  Bechtel's Project team told Bechtel's senior management:  **During the**

**development process, and before we deliver the Target Cost, we will also provide trends based on our current project experience, with a particular emphasis on Prairie State given AMP-O**.  (Opp. Ex. 30, p. 7) (emphasis added).

Moreover, as discussed at p. 15-16, supra, Bechtel's April 14, 2009 Project Controls presentation to AMP specifically stated that Bechtel would trend many types of trends including pricing, quantity fluctuation, design changes and productivity and identified the "Key Trend Program Attributes" as "Baseline in place; Early Identification; Informed Decision Making; Timely Decision Making;" and "NO SURPRISES."  (Opp. Ex. 44, p. 36) (emphasis in original).

Finally, the record clearly does not support Bechtel's contention (Bechtel MSJ, p. 17) that the parties agreed at the February 9, 2009 kick-off meeting that the trend program would be limited to scope items.  First, Bechtel's (subsequent) Project Controls Presentation of April 14, 2009 clearly contradicts Bechtel's position. (Opp. Ex. 44). Second, the minutes of the February kick-off meeting do not support Bechtel's contention. (Opp. Ex. 41). Rather, they reflect that at that very early date in the Project, the focus "currently" was on "primarily" defining scope items in Appendix T-3. (Id., p. 2). Nowhere do the minutes state an intention to change the EPC Contract's trend provision that clearly required trending of all the different types of potential cost and schedule impacts.  Moreover, Beck's Clark, who was present at that February meeting, directly contradicted Bechtel's present contention.  He testified that Appendix T-3 was only "a part of the trend program.  It wasn't all of it, though." (Opp. Ex. 42, p. 128). Clark's testimony is completely confirmed in the internal Bechtel email sent by Randy McCarraher, Bechtel's Project Controls Manager, immediately following the February 9, 2009 kick-off meeting discussed at p. 14 above.  McCarraher wrote:

"We had a kick-off meeting with our owner on AMP this afternoon and one of the items the Owner discussed was our trend program. **They indicated they wanted to start regular meetings to review trends on the job so they could get an early handle on where costs were going.**

(Opp. Ex. 70) (emphasis added).

Not only is Bechtel's position factually unsupported, its contention that the alleged discussion at this meeting changed the express provisions of the EPC Contract is contrary to Ohio law.  The EPC Contract clearly prohibits oral amendments.  As stated in EPC Contract § 20.13 governing contract amendments, "[e]xcept as provided in Section 10.2 [governing Change Orders, only], no amendments or modifications of this Agreement will be valid unless evidenced in writing and signed by both Parties."  (Opp. Ex. 31).

"Ohio law is very clear that a contract that expressly provides that it may not be amended, modified, or waived except in writing executed by the parties is not subject to oral modification."  *Kelley v. Ferraro*, 936 N.E.2d 986, 994-95 (Ohio Ct. App. 2010) (citations omitted).  Federal courts applying Ohio law have held that where an agreement clearly and unambiguously prohibits oral modification of its terms, such oral modification is entirely ineffective under Ohio law.  *DiPietro v. Morgan Stanley DW, Inc.*, 517 F. Supp. 2d 1016, 1025 (S.D. Ohio 2007).

Nor is there any evidence, much less undisputed evidence, that AMP clearly and unequivocally waived the written amendment requirement in the EPC Contract.  *See, e.g.*, *Snowville Subdivision Joint Venture Phase I v. Home S. & L. of Youngstown, Ohio*, No. 96675, 2012 WL 1067748, at *4 (Ohio Ct. App. Mar. 29, 2012).

Thus, Bechtel was obligated to trend many different types of potential impacts to cost and schedule (i) under the express provisions of the EPC Contract; (ii) as a matter of established Bechtel corporate policy; (iii) pursuant to Bechtel's April 2009 Project Controls Presentation;

and (iv) per Professional and Industry Standards.  (Opp. Ex. 37, p. 26, 65). As discussed, infra, at Section IV, E, Bechtel wantonly and recklessly failed to do so.

### 5.      Then Current Estimate

Rather incredibly Bechtel argues that its multifaceted trend obligations (except for scope) did not arise "until at least around mid-summer 2009, at which point the estimate effort would commence."   (See, Bechtel MSJ, p. 17).   The overwhelming record evidence, however, contradicts Bechtel's contention.  The EPC Contract clearly required Bechtel to trend against "the current estimate basis." (Opp. Ex. 31).  The evidence establishes that the "current estimate basis" was the Indicative Target Price until the Target Price was established some ten months into the Project. Further, Bechtel's obligation to trend began on January 1, 2009, the EPC Contract's Effective Date. Even Bechtel's expert, Richard Sieracki, concedes that the Indicative Target Price was "the current estimate basis" that Bechtel was to trend against until establishment of the Target Price.  (Opp. Ex. 33, p. 292).

Bechtel wantonly and recklessly failed to trend as required against the Indicative Target Price.

### 6.      Reporting to AMP

Bechtel cannot legitimately dispute that it was required to issue regular and meaningful trend reports to AMP from the Effective Date forward.  The EPC Contract expressly states that "as trends are identified they will be documented and reviewed with the AMP team members on a periodic basis but no less frequently than monthly."  (Opp. Ex. 31, App. V, p. 12).

This requirement allows AMP to "fully evaluate and consider these developments before incorporating them into the project scope or execution plan" and is also required by Bechtel's Corporate Trend Procedure and by Professional and Industry Standards.  (Id., App. V; Opp. Ex. 34, p. 11; Opp. Ex. 37, p. 26, 65).

Bechtel wantonly and recklessly failed to issue the required trend reports to AMP.

### 7.     Other Related Provisions

The EPC Contract contained additional provisions that emphasized the absolutely critical importance of Bechtel's timely and complete sharing with AMP of its proprietary cost information and updates to the Indicative Target Price.  For example, Articles 2.3.1 and 5.2.3 and Appendix V, Sections 2.4, 2.5 and 3 required Bechtel to establish and maintain a detailed project controls and budgeting system and to report to AMP on a regular basis with respect thereto. (Opp. Ex. 31).

As is discussed infra at Section IV, E, Bechtel wantonly and recklessly failed to do so.

### D.     Bechtel Materially Breached the EPC Contract

For purposes of its motion for summary judgment, Bechtel concedes that a genuine dispute of material fact exists regarding whether it breached the EPC Contract's trend provisions. (Bechtel MSJ, fn. 19, p. 30).  It seeks summary judgment only on its arguments that it did not "wantonly" breach the contract and that AMP's damages are speculative.  It then proceeds, however, to argue that it complied with the EPC Contract's trend requirements.

In fact, the record evidence overwhelmingly establishes that Bechtel materially breached the EPC Contract, particularly the trend-related provisions of Appendix V and Section 2.2 that required Bechtel to perform its Work to Professional Standards.   (Opp. Ex. 31). Bechtel materially breached the EPC Contract by failing to: (i) implement a proper, complete trend program beginning January 1, 2009 and to maintain it thereafter; (ii) establish and maintain a formal trend program as required by its Corporate Trend Procedure, Industry and Professional Standards; (iii) assign a trend engineer to the AMPGS Project; (v) trend against the Indicative Target Price; and (vi) most significantly, its complete failure to trend and report to AMP potential cost and schedule impacts, particularly significant known cost impacts from its

experience on other "similar" projects. Bechtel's material breaches of the EPC Contract denied AMP the critically important "early warning system" that would have prevented Bechtel's late October 2009 $1 Billion surprise increase in the EPC costs that subjected AMP to nearly $100 million in damages.

Despite being paid many millions of dollars by AMP, the evidence proves that Bechtel never implemented the required trend program. For example, Bechtel never assigned a trend engineer to AMPGS (Opp. Ex. 68, p. 55-56; Opp. Ex. 40, p. 136-37, 187-88; Opp. Ex. 35, p. 48), even though Bechtel's Corporate Trend Procedure required it to do so. (Opp. Ex. 34, p. 3).

Moreover, although the EPC Contract required Bechtel to implement the trend program "during the early stages of the Preliminary Phase," numerous Bechtel witnesses testified that Bechtel had no intention of assigning a trend engineer or implementing the trend program until after establishment of the Target Price and once the "execution," i.e., construction began on AMPGS.  (Opp. Ex. 40, p. 136-37; Opp. Ex. 68, p. 116-18).

Bechtel failed to take even the most basic steps required for the trend program.  Bechtel's Corporate Trend Procedure requires specific forms for a Trend Register and Trend Summary. (Opp. Ex. 34). Contrary to Bechtel's contentions on pages 32-34 of its Memorandum, Bechtel's belated August, September and October 2009 Progress Reports (received by AMP in September, October and November) (Bechtel MSJ, Ex. 32, 33, 34) do not satisfy those requirements and stand in contrast to the trend summaries that Bechtel maintained on other similar projects. (Opp. Ex. 57).  Bechtel also failed to trend against the "current estimate basis" as discussed at p. 34 above.

Most egregiously, Bechtel failed to identify and report to AMP significant, known "potential cost and schedule impacts" to AMP thereby denying it the ability to "fully evaluate

and consider" them "before incorporating them into the project scope and/or execution plan."  As discussed above, Bechtel **never** trended the Indicative Target Price with any of the substantial potential cost impacts known to it and documented in its records for similar projects. (Opp. Ex. 37, p. 26; Opp. Ex. 71, p. 136-40; Opp. Ex. 22, p. 156-57).

The overwhelming evidence establishes that Bechtel materially breached the EPC Contract.  For purposes of Bechtel's motion, at a minimum **a genuine dispute of material facts exists regarding Bechtel's breach of the EPC Contract precluding summary judgment.**

### E.      Bechtel's Conduct Was Wanton and Reckless

In its 2012 Order, the Court held that "wanton conduct" occurs when one fails "to exercise any care toward one to whom a duty of care is owed when the failure occurs under circumstances for which the probability of harm is great and when the probability of harm is known to the tortfeasor."  (2012 Order at 7).  This definition is similar to the one set forth by the Ohio Supreme Court in *Anderson v. Massillon*, *supra*, and fits squarely here with Bechtel's acts and omissions as evidenced by substantial record evidence.  In addition, *Anderson*, now makes clear that wanton conduct is distinguishable from reckless conduct and, based upon the cases cited by AMP in Section IV, A, above, reckless conduct will similarly render the limitation of liability clause unenforceable.[14]

First, as discussed, infra, in Section IV, C, Bechtel had very specific and critically important trend obligations under the EPC Contract. Bechtel knew that the acknowledged purpose of these obligations was to protect AMP from "surprises" and to serve as an effective "early warning system" for potential cost impacts to the Indicative Target Price.  Bechtel also

---

[14] The Ohio Supreme Court's opinion in *Anderson* is fully applicable to this case even though it was rendered after this Court's 2012 Order.  A denial of a motion to dismiss is an interlocutory order.  *Hudson v. Hudson*, 475 F.3d 741, 743 (6th Cir. 2007).  Generally, if there is an intervening change of controlling law, district courts will find justification for reconsidering interlocutory orders.  *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 Fed. Appx. 949 (6th Cir. 2004).

knew that the substantial risks associated with undisclosed potential cost impacts were significant, especially during the Project's early months. (See, e.g., Opp. Ex. 22, p. 168-71; Opp. Ex. 21; Opp. Ex. 26; Opp. Ex. 72; Opp. Ex. 45; Opp. Ex. 46). Second, as discussed, infra, in jSection IV, D, Bechtel completely failed to perform its trend obligations. These failures were systemic and included the failure to even assign a trend engineer and to establish the formal trend program required by its own Corporate Trend Procedure. Third, as discussed above in Section II, F, Bechtel had all the reports, data and information necessary to fulfill its trend obligations including data that key Bechtel AMPGS managers had readily available. (Opp. Ex. 39, p. 58-68; Opp. Ex. 40, p. 32-33; Opp. Ex. 22, p. 215-18, 236-42; Opp. Ex. 35, p. 74-86; Opp. ex. 37, p. 25-26, 30-31, 36-38, 44-53, 56-64). Yet Bechtel wantonly and recklessly failed to use its data to trend against the Indicative Target Price and otherwise report its skyrocketing costs to AMP. See, infra, in Section IV, E.

Bechtel's reckless indifference and wanton lack of care is epitomized by the McCarraher email discussed above:

> **That said, without a trend engineer the first meeting has the potential to be pretty embarrassing for us as we have little more than what the owner saw during the development period back in September. I really could use some help on this one considering Tony Brower was re-routed to Trimble before he could get started. For the record, this needs to be a fulltime resource.**

(Opp. Ex. 70) (emphasis added).

Not only did Bechtel fail to provide a "fulltime [sic] resource," Bechtel never assigned any trend engineer to AMPGS. (Opp. Ex. 40, p. 136-37; Opp. 35, p. 48).

Bechtel knew that its failure to properly trend and timely report potential cost increases to AMP would cause it grave harm. In fact, its Corporate Trend Procedure made clear that there is a heightened need for Bechtel to trend properly and timely on cost reimbursement contracts like

38

AMPGS since cost increases are to the account of the owner. (Opp. Ex. 34, p. 7). Also, as AMP's agent for Agency Contracts, it was also uniquely aware of the great financial risk to AMP in entering into contracts with Hitachi with significant multi-million dollar termination liability provisions.

Furthermore, the overwhelming evidence establishes that Bechtel's $1 Billion October surprise resulted from increases in the very same cost items that were skyrocketing on Bechtel's similar projects but never disclosed to AMP. (Opp. Ex. 37, p. 26). This failure to act in circumstances in which there is a great probability of harm to AMP constitutes "wanton conduct." *Anderson, Admr. v. City of Massillon, et al.*, 134 Ohio St.3d 380 (2011). Similarly, this failure to act shows a conscious disregard of or indifference to a known or obvious risk to AMP and was "reckless conduct." *Id.* at syllabus ¶4. Indeed, Bechtel's indifference in failing to trend mirrors the indifferent attitude expressed in its internal emails during development of the indicative estimate in 2008, when Bechtel was "still selling" the project to AMP.

Lastly, there is no merit to Bechtel's argument that since it performed some work under the EPC contract, its acts and omissions do not constitute wanton conduct. First, Bechtel's argument erroneously assumes that Bechtel properly performed its multifaceted trend obligations. (Bechtel MSJ, p. 34-36). The record evidence clearly proves that it utterly failed to do so. See discussion infra in Section IV, D.

Second, Bechtel's argument, that since it performed other contractual obligations, it cannot be found to have acted wantonly, is contrary to Ohio law. (See, Bechtel MSJ, §V,A). Ohio law has long stated that it does not matter if a party complies with some or even most of its contractual obligations when that party's failure to comply with a crucial contractual requirement destroys the contract's value or purpose. *Hansel v. Creative Concrete & Masonry Constr. Co.*,

39

772 N.E.2d 138, 141 (Ohio Ct. App. 2002) (citations omitted); *Wengerd v. Martin*, No. 97CA0046, 1998 WL 225107, at *2-3 (Ohio Ct. App. May 6, 1998). While these cases deal with a contract breach, they also make clear that Bechtel cannot excuse its wanton failure to comply with the critical trend requirements of the contract by citing to other work it performed. Further, as with wanton or reckless conduct, under Ohio law the determination of whether obligations in an agreement have been substantially performed is an issue for the finder of fact. *Warren Concrete and Supply, Inc. v. Strohmeyer Contracting, Inc.*, No. 2010-T-0004, 2010 WL 4470724, at *4 (Ohio Ct. App. Nov. 5, 2010).

The overwhelming evidence establishes that Bechtel systemically and materially failed to perform its trend obligations, knowing their great importance to AMP and the severe harm that would result to AMP from its failure to trend. The overwhelming evidence also establishes that Bechtel consciously disregarded and was indifferent to that known risk of harm. Accordingly, Bechtel's wanton and/or reckless conduct renders the EPC Contract's limitation of liability clause unenforceable. At a minimum, **a genuine dispute of material facts exists regarding whether Bechtel: (1) exercised any care toward AMP with respect to its trending obligations; (2) whether there was great probability of harm to AMP; (3) whether Bechtel displayed a conscious disregard of or indifference; (4) to a known or obvious risk of harm to AMP; (5) which was unreasonable under the circumstances.**

### F. AMP's Claim for Damages is Based on a Well-Established Theory of Reliance Damages and is Fully Supported by the Record.

#### 1. AMP's Reliance Damages Consist of Costs AMP Incurred in Reliance on the EPC Contract.

AMP's damages consist of the costs it incurred in performing the EPC Contract. AMP's costs exceed $90 million and include payments to Hitachi for the boilers and steam turbine generators; payments to Bechtel as the EPC contractor; payments to Powerspan for the air

quality control system development; payments to consultants such as Beck; payments to various contractors; payments to exercise options to purchase the real estate; payments to various law firms for the Project's pre-litigation legal expenses; and internal AMP labor and overhead.  (Opp. Ex. 53, No. 17). As set forth below, AMP incurred these costs in reliance on the EPC Contract.

In response to Bechtel's 30(b)(6) deposition notice related to damages, AMP designated AMP's General Counsel, John W. Bentine.  Additionally, AMP retained a cost construction expert, William Kime, who prepared an expert report dated October 19, 2012 and a supplemental expert report dated January 16, 2013, that identify in detail the costs that AMP incurred on AMPGS that it claims as damages in this matter. (Opp. Ex. 74). Bentine testified that AMP "went into" AMPGS and "spent money on this project in reliance on what Bechtel said it was going to do" with respect to Bechtel's trend obligations under the EPC Contract.  (Opp. Ex. 61, p. 128-29). Bentine testified at length about the specifics of AMP's damages.  (Id., p. 30-64). Kime reviewed, analyzed and audited AMP's cost records for AMPGS and determined that AMP incurred the following costs on AMPGS and that they were accurate, approved and related to AMPGS including $56,094,761 to Hitachi; $16,538,717 to Bechtel; $4,369,810 to Powerspan; and $10,763,859 in other costs for a total, after including prejudgment interest through December 2012, of $97,577,884. (Opp. Ex. 75, p. 1).

### 2. AMP's Damages Are Based on a Reliance Damage Theory.

AMP's damage claim is based on a reliance damage theory that is black-letter law and a well-recognized alternative to expectation damages. The Restatement of the Law, Second, Contracts §349 states:

As an alternative to the measure of damages stated in §347 [expectation damages], **the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance**, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed. (emphasis added).

Reliance damages are oftentimes chosen by a plaintiff where there may be difficulties in proving or measuring expectation damages. *Restatement (Second) of Contracts § 349* (1981), comment a; *Restatement (Second) of Contracts § 352* (1981), comment a ("Although the [uncertainty] requirement applies to damages based on the reliance as well as expectation interest, there is usually little difficulty in proving the amount that the injured party has actually spent in reliance on the contract, even if it is impossible to prove the amount of profit that he would have made.")(emphasis added); *E. River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 874 (1986)(noting that reliance damages "are awarded in contract when there is particular difficulty in measuring the expectation interest."); *Am. Capital Corp. v. FDIC*, 472 F.3d 859, 869 ("Reliance damages allow the injured party to get back the expenditure it made in reliance on the contract. Essentially, the injured party may not be able to prove with reasonable certainty what it would have made if the contract was performed; however, it may be able to prove what expenditures it made in relying on the contract.")

To recover its reliance damages a plaintiff "must prove both that it incurred those expenditures and that it incurred them in preparation for performance or in performance." *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 154, 2002 U.S. Claims LEXIS 70 (2002), *overruled on different grounds*. Although reliance damages are based on "expenditures

[that] were not caused by the breach, the assumption is that they were transformed into losses by the breach." *In re Yeager Co.*, 227 F.Supp. 92, 96-97 (N.D. Ohio 1963).[15]

"When used in the context of reliance damages, the causation inquiry concerns whether the contract undertaking itself caused the expenditures or losses in question." *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. at 155. Accordingly, a plaintiff "must show that the expenses submitted as reliance damages were incurred in reliance on the contract, or that losses were sustained as a result of reliance on the contract." *Id.*[16] Disputes of fact on this issue will preclude summary judgment. *Id.* at 155-56; see also, *ATM Exch., Inc. v. VISA Int'l Serv. Ass'n*, No. 1:05-CV-00732, 2008 U.S. Dist. LEXIS 84289, *19, 20 (S.D. Ohio Oct. 21, 2008). Other courts have stated that in order to recover reliance damages, the plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation. *Am. Capital Corp. v. FDIC*, 472 F.3d 859, 867 (Fed. Cir. 2006), citing, *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1378 (Fed. Cir. 2001). As previously discussed, Bechtel cannot legitimately dispute the fact that it knew that AMP was incurring costs under the EPC Contract. Furthermore, foreseeability is a question of fact that prevents summary judgment. *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1366 (Fed. Cir. 2005).

### 3. Bechtel's Damages Argument Misses the Mark and is Inapplicable to Reliance Damages.

In its Memorandum, Bechtel attempts to create a straw man by misconstruing AMP's damages theory and by applying an erroneous causation standard. Bechtel erroneously states that "[f]or AMP to prove that these damages were caused by Bechtel, AMP must show that

---

[15] In *Yeager*, the court analyzed reliance damages in detail and referenced the Restatement §333, the predecessor to the current section on reliance damages, Restatement §347. *Yeager* also noted that Ohio "courts have long recognized a plaintiff's right to recover damages to protect what is known as his reliance interest." *Id.* at 97, citing, *Hill v. Anderson*, 9 Ohio Dec. 480 (1899).

[16] Meanwhile, in reliance damages, the defendant may attempt to prove any losses that plaintiff would have incurred in the event of full performance of the contract. *Id.* Here, Bechtel's damages expert is unable to testify as to any such losses in the event AMPGS had been built. (Opp. Ex. 76, p. 66).

Bechtel should have provided information about increased EPC costs earlier; and AMP would have taken action at that earlier time based on the information to avoid the development costs AMP expended." (Bechtel MSJ, p. 37)[17]  This is not the correct causation standard for reliance damages.  As cited above, the requisite causation element for reliance damages is quite limited: "the causation inquiry concerns whether the contract undertaking itself caused the expenditures or losses in question."  *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. at 155.  Accordingly, a plaintiff "must show that the expenses submitted as reliance damages were incurred in reliance on the contract, or that losses were sustained as a result of reliance on the contract."  *Id.*

Here, the record is clear that AMP seeks the costs that it incurred in reliance on the EPC Contract, including specifically Bechtel's trending obligation.  As Mr. Bentine testified:

> **AMP alleges that Bechtel didn't do what it was supposed to do to give us information that they knew, should have known, should have given to us, so that we could make informed decisions about what money we were spending and putting at risk with regard to this project from the time that we signed the contract**, and frankly maybe before we signed the contract, up until the project was cancelled **that caused AMP significant damage in dollars expended**, . . .
>
> *          *          *
>
> Yes, we have gone back to January 1st, and, as I said, maybe we could have gone back further. It would appear to us that Bechtel didn't do its job from day one of coming up with the indicative estimates. They didn't update that as they were required to do by trending which they told us before we signed the contract that there weren't going to be any surprises, that they were going to use the suites of projects that they were working on and that they used to come up with the indicative price for our project. We don't believe that they did that. We believe they ignored that obligation. We believe that we got, my word, low-balled on the indicative price, and to our great detriment, **so picking January 1 was, in my view, from a factual standpoint conservative and reasonable to try to**

---

[17] Without citing any case law, Bechtel erroneously asserts that: "To prove, rather than merely speculate, that Bechtel caused AMP to suffer the alleged damages, AMP must establish that i.) Bechtel should have informed AMP earlier than it did of a specific cost increase, the failure of which was a willful and wanton breach; and, ii.) that AMP would have studied the Project at that time and determined that the Project should be canceled immediately due to that cost increase…."  (Bechtel MSJ, p. 38-39). Moreover, this is not a correct statement of AMP's damages theory as set forth herein and as identified by Bentine in his deposition. (Opp. Ex.61, p. 117).

**identify the damages that we had in reliance on Bechtel doing its job and doing what it said it would do with regard to keeping us informed so that we could make adequate decisions about expenditures for this plant**.

(Opp. Ex. 61, p. 117-19).

Later, when pressed again, Bentine explained:

**I'm telling you that in our belief the trending that Bechtel said it was going to do wasn't done from the beginning of the effective date of the EPC contract** and potentially before that in coming up with the indicative prices even before that. The August 2008. In retrospect, we are not sure whether or not that was a true and accurate indicative price that was given us then. So yeah, had we had the information that the productivity in all those other jobs was significantly less than was used for our job, had we had that information on trending of what was going on at Springerville, Price Date [sic Prairie State], Elm Road and other jobs, electric generation facilities that were being built by Bechtel which Bechtel told us we have the best proprietary methodologies for coming up with what is going on at all of our sites and can utilize that data to give you good information about what your project is going to cost, that didn't happen apparently, **and as a result we went into this project and spent money on this project in reliance on what Bechtel said it was going to do and when they finally did do it the price went up to $3.3 billion,** and we had no confidence it wasn't going to go further up and we had very little confidence then in the Bechtel's touted ability to estimate what things were going to cost. Certainly no guarantee that the costs weren't going to go up.

(Id., p. 128-29).

Furthermore, it is axiomatic that AMP incurred costs under the EPC Contract for major equipment, Powerspan, land, and various contractors, consultants and attorneys. Importantly, Bechtel does not argue, nor does it cite to any supporting evidence as required by FRCP 56(c), that these costs claimed by AMP as damages were not incurred in reliance on the EPC Contract.

The evidence supporting AMP's reliance damages is indisputable. At a minimum, it creates **a genuine dispute of material facts regarding whether (1) AMP incurred expenditures; (2) in preparation for performance or in performance of the EPC Contract; and (3) whether those expenditures were foreseeable to Bechtel.**

45

Likewise, Bechtel does not argue, nor does Bechtel cite to any supporting evidence as required by FRCP 56(c), that the costs AMP incurred under the EPC Contract were not foreseeable.  Indeed, as discussed above, Bechtel served as AMP's agent with respect to Hitachi and Powerspan and negotiated those key agency contracts on AMP's behalf.  (Opp. Ex. 31, §2.2.20, Appx. W, G).  Bechtel was also well aware of the money AMP would spend on Bechtel itself (Id., §2.2), real estate (Id., §3.1, Appx. A, S), Beck (Id., §3.6), contractors (Id., §2.8, Appx. G) and lawyers to finalize the contract and obtain the required Owner Permits (Id., §3.2, Appx. F).  Again, it is axiomatic that AMP's costs incurred on major equipment, land, consultants and contractors were all foreseeable to Bechtel. [18]

### 4.    The Cases Cited by Bechtel Are Distinguishable

Bechtel relies on *Infocision Mgmt. Corp. v. Found. for Moral Law Inc.*, No. 5:08CV1342, 2010 WL 750141 (N.D. Ohio Mar. 1, 2010) and *Atlantis Info. Tech., GmbH v. CA, Inc.*, No. 06-CV-3921, 2011 WL 4543252 (E.D.N.Y. Sept. 28, 2011) to support its claim that AMP's damages are speculative and cannot be recovered.  (Bechtel MSJ, p. 38-42).  Those cases are clearly distinguishable.  First, neither *Infocision* nor *Atlantis* are reliance damages cases. *Infocision* is an expectation damage case where the plaintiff was seeking to recover lost profits and lost revenues related to so-called donor burnout and alleged spoiling of a telemarketing donor pool.  *Infocision* at *4.  The court granted summary judgment because there was no evidence that actual donors were burned out or refused to give subsequent donations due to

---

[18]  As set forth above, Bechtel has cited no evidence to contest the fact that AMP's damages were incurred by AMP in reliance on the EPC contract including specifically Bechtel's trending obligation and the fact that AMP's damages were foreseeable to Bechtel.  Additionally, Bechtel has cited no evidence of any losses that AMP would have incurred in the event of full performance of the contract and Bechtel's damages expert was unable to identify any such losses.  (See, Opp. Ex. 76, p. 66). Accordingly, under Rule 56(e)(2) and (f)(1) the Court may enter summary judgment for AMP on these limited issues.

Infocision's actions. Here, AMP's reliance damages bear no relationship whatsoever to Infocision's conjectural lost revenue damages being sought under an expectation damage theory.

Likewise, *Atlantis* is a case involving expectation and restitution damages, not reliance damages. *Atlantis*, at *24 ("CA's alleged damages are based on <u>restitution</u> premised on a royalty payment and on <u>expectation</u> damages premised on the idea that CA would have ceased paying Atlantis royalties as soon as it learned of the alleged breach and developed a replacement for E/NAT."(emphasis added.)) In *Atlantis*, CA sought unspecified expectation damages "premised on the curative steps it would have taken in 2002 or 2003 had it known that Atlantis had stopped developing updates for E/NAT, namely that it would have developed software comparable to E/NAT and stopped paying Atlantis royalties." *Atlantis*, at *27. Here, AMP is not claiming damages premised upon any "curative steps" it hypothetically would have taken had Bechtel informed AMP earlier of the surprise $1 Billion increase in EPC Costs. Rather, AMP claims that Bechtel materially, wantonly and recklessly breached the EPC Contract and thus transformed the costs that AMP incurred under the EPC Contract into reliance damages. *Yeager, supra*.

Neither *Infocision* nor *Atlantis* deal with the certainty requirement associated with reliance damages. The Restatement is explicit on this issue that "[a]lthough the [uncertainty] requirement applies to damages based on the reliance as well as the expectation interest, there is usually little difficulty in proving the amount that the injured party has actually spent in reliance on the contract, even if it is impossible to prove the amount of profit that he would have made." *Restatement (Second) of Contracts § 352* (1981), comment a. Applying the Restatement, rather than the inapplicable *Infocision* and *Atlantis*, AMP has established its damage claim with the requisite certainty.

**5. Bechtel's Remaining Arguments That AMP's Damages are Speculative and That AMP Must Rule Out Other Causes of Cancellation Are Irrelevant to a Determination of Reliance Damages and Are Without Merit.**

In its Memorandum, Bechtel erroneously states that "AMP claims that the increase in the estimated cost of building AMPGS, if provided by Bechtel earlier, would have caused AMP to terminate the Project." (Bechtel MSJ, p. 41). AMP simply does not have to establish "what it would have done" had Bechtel not breached its trending obligations in order to recover its reliance damages. Rather, AMP need only establish that Bechtel materially breached the EPC Contract and that AMP incurred expenses in reliance on the contract. AMP does not need to jump through an additional "hoop" to recover its reliance damages.

Likewise, a recovery based on reliance damages does not require AMP to rule out alleged other reasons for the cancellation of the plant. If Bechtel wishes to argue that AMP cancelled the plant for reasons other than its surprise $1 Billion increase in the EPC Costs, it may do so at trial. However this argument goes, if at all, only to the issue of whether Bechtel's breach caused the project to be terminated. It does not relate to the issue of the amount of reliance damages that AMP is entitled to recover if it is successful in establishing Bechtel's material breach. Furthermore, Bechtel is not seeking, nor is it entitled to, summary judgment on the issue of its breach.

Lastly, even if AMP did have to establish what it would have done had Bechtel not breached its trending obligations, or rule out other alleged causes for the cancellation of AMPGS, **genuine disputes of material facts clearly exist regarding what AMP would have done and the reasons for cancellation of the Project that preclude summary judgment.** For instance, Bentine testified that "things would have been done differently, much differently had we had the benefit of Bechtel's actual experiences on those other jobs from day 1 in this contract

and we didn't."  (Opp. Ex. 61, p. 121)[19]  This portion of Bentine's testimony alone establishes that AMP would have proceeded differently if it had known that Bechtel had materially, wantonly, and recklessly breached its trending obligations under the EPC Contract. Clark's May 1, 2009 email to Bechtel corroborates Bentine's testimony by informing Bechtel that AMP was "honestly concerned that the Project may not move forward" and by the fact that the Project was terminated soon after Bechtel finally told AMP about the $1 Billion increase in EPC Costs. Clark's Declaration also makes this point clear. (Opp. Ex. 79).  Moreover, many AMP witnesses testified that the $1 Billion cost increase, not other reasons, caused the termination of AMPGS. For example, Bechtel mischaracterizes the testimony of AMP's economic expert Mike King regarding the cause of the cancellation.  See King Declaration at ¶9.  (Opp. Ex. 78).  (See also, Opp. Ex. 53, No. 2; Opp. Ex. 61, p. 137-39; Opp. Ex. 42, p. 318-19; Opp. Ex. 14, p. 195-96, 202-06, 208; Opp. Ex. 64, p. 165-66; Opp. Ex. 52, p. 287-90; Opp. Ex. 62, p. 238, 291-92; Opp. Ex. 65, p. 203, 206; Opp. Ex. 66, p. 213, 237).

---

[19] See also (Opp. Ex. 61, p. 127-28) "…had we known in May when we asked for an update what was going on in all the other projects that I don't believe we would have exercised the options or signed the agreement with Hitachi…."

## V.     CONCLUSION

Construing the evidence produced in the light most favorable to AMP, and drawing all justifiable inferences in its favor, the Court can only conclude that genuine disputes of material facts exist, that Bechtel is not entitled to judgment as a matter of law and that, accordingly, Bechtel's motion for summary judgment must be denied.

Respectfully submitted,

*/s/ Stephen C. Fitch*
Stephen C. Fitch (0022322) (Trial Attorney)
sfitch@taftlaw.com
David J. Butler (0068455)
dbutler@taftlaw.com
Taft, Stettinius & Hollister LLP
65 East State Street, Suite 1000
Columbus, Ohio 43215
Telephone: (614) 221-2838
Facsimile:   (614) 221-2007

Judah Lifschitz (admitted *pro hac vice*)
lifschitz@slslaw.com
John T. Bergin (admitted *pro hac vice*)
bergin@slslaw.com
Shapiro, Lifschitz & Schram
1742 N Street, N.W.
Washington, DC 20036
Telephone: (202) 689-1900
Facsimile:   (202) 689-1901

*Counsel for Plaintiff*
*American Municipal Power, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and accurate copy of the foregoing was

served through the Court's CM/ECF system this 29th day of March, 2013 on the following:

William G. Porter, Esq.
Douglas R. Matthews, Esq.
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008

Michael P. Subak, Esq.
Richard W. Foltz, Jr., Esq.
Joseph T. Imperiale, Esq.
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pennsylvania 19103-2799

*Counsel for Defendant*

/s/ Stephen C. Fitch
Stephen C. Fitch

31359838.1

51